ORAL ARGUMENT NOT YET SCHEDULED

IN THE

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

Nos. 12-1008 and 12-1081

———————

TC RAVENSWOOD, LLC, *et al.*, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

———————

On Petition for Review of Final Action of the

Federal Energy Regulatory Commission

———————

INITIAL BRIEF OF PETITIONERS

———————

Kristine L. Delkus
TransCanada Corporation
450 – 1st Street, S.W.
Calgary, AB
Canada T2P 5H1
(403) 920-2161
us_regulatory_law@transcanada.com

James M. D'Andrea
TransCanada USA Services Inc.
110 Turnpike Road, Suite 203
Westborough, MA 01581
(508) 475-6088
jim_dandrea@transcanada.com

Kenneth L. Wiseman
Mark F. Sundback
Lisa M. Purdy
William M. Rappolt
J. Peter Ripley
Blake R. Urban
Andrews Kurth LLP
1350 I Street, NW, Suite 1100
Washington, DC 20005
(202) 662-2700
kwiseman@andrewskurth.com
msundback@andrewskurth.com
lpurdy@andrewskurth.com
wrappolt@andrewskurth.com
pripley@andrewskurth.com
burban@andrewskurth.com

ATTORNEYS FOR TC RAVENSWOOD, LLC

(Additional Counsel Appear on the Next Page)

Christopher C. O'Hara
Abraham H. Silverman
NRG Energy, Inc.
211 Carnegie Center
Princeton, NJ 08540
(609) 524-4696
Abraham.silverman@nrgenergy.com
Chris.ohara@nrgenergy.com

Robert C. Fallon
Marcia A. Stanford
Leonard, Street and Deinard
1350 I Street, NW
Suite 800
Washington, DC 20005
(202) 346-6900
Fallonr@leonard.com
Marcia.Stanford@leonard.com

ATTORNEYS FOR THE NRG COMPANIES

DATED:  July 13, 2012

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.**     **Parties and Amici**

    **1.**     **Parties and Amici before the Federal Energy Regulatory Commission**

Arthur Kill Power LLC
Astoria Gas Turbine Power LLC
Astoria Generating Company, L.P.
Bayonne Energy Center, LLC
Calpine Corporation
Central Hudson Gas & Electric Corporation
Consolidated Edison Company of New York, Inc.
Constellation Energy Commodities Group, Inc.
Constellation Energy Nuclear Group, LLC
Constellation NewEnergy, Inc.
Dunkirk Power LLC
Dynegy Northeast Generation, Inc.
Dynegy Power Marketing, Inc.
Electric Power Supply Association
Entergy Power Marketing Corporation
Huntley Power LLC
GenOn Energy Management, LLC
GenOn New York, LLC
GenOn Bowline, LLC
Independent Power Producers of New York, Inc.
Long Island Power Authority
Multiple Intervenors
New York Independent System Operator, Inc.
New York Power Authority
New York State Consumer Protection Board
New York State Electric & Gas Corporation
New York State Public Service Commission
New York Transmission Owners
Niagara Mohawk Power Corporation, *d/b/a* National Grid
NRG Power Marketing LLC
Orange and Rockland Utilities, Inc.
Oswego Harbor Power LLC

i

PSEG Energy Resources & Trade LLC
PSEG Power New York LLC
Rochester Gas and Electric Corporation
Sithe/Independence Power Partners, L.P.
TC Ravenswood, LLC
TransCanada Power Marketing Ltd.

**2.      Parties and Amici before this Court**

Arthur Kill Power LLC
Astoria Gas Turbine Power LLC
Astoria Generating Company, L.P.
City of New York
Consolidated Edison Company of New York, Inc.
Dunkirk Power LLC
Federal Energy Regulatory Commission
Huntley Power LLC
Multiple Intervenors
New York Independent System Operator, Inc.
NRG Power Marketing LLC
Orange and Rockland Utilities, Inc.
Oswego Harbor Power LLC
Public Service Commission of the State of New York
TC Ravenswood, LLC

**B.    Rulings Under Review**

The rulings of the Federal Energy Regulatory Commission under review are:

1.    *New York Indep. Sys. Operator, Inc.*, **"Order Accepting Tariff Revisions Subject to Modification, Suspending for Five Months, and Directing Compliance Filing,"** 134 FERC ¶ 61,058 (Jan. 28, 2011), amended by *New York Indep. Sys. Operator, Inc.*, **"Errata Notice,"** (Feb. 17, 2011).

2.    *New York Indep. Sys. Operator, Inc.*, **"Order on Requests for Expedited Clarification and Rehearing,"** 134 FERC ¶ 61,178 (Mar. 9, 2011).

WAS:184083.7

3. *New York Indep. Sys. Operator, Inc.*, "**Letter Order Accepting Filing to State Currently Effective Installed Capacity Demand Curves and Motion to Withdraw February 17, 2011 Filing**," 135 FERC ¶ 61,002 (Apr. 4, 2011).

4. *New York Indep. Sys. Operator, Inc.*, "**Order on Rehearing**," 135 FERC ¶ 61,170 (May 19, 2011).

5. *New York Indep. Sys. Operator, Inc.*, "**Order on Rehearing**," 137 FERC ¶ 61,218 (Dec. 15, 2011).

## C.    Related Cases

The orders under review are the subject of the petitions for review in this case (Nos. 12-1008 and 12-1081). This case has not previously been before this Court or any other court. The orders under review and the issues to be decided in the instant case are not related to any other cases of this Court or any other court or subject to review before the Federal Energy Regulatory Commission ("Commission" or "FERC").

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Petitioners hereby submit the following Corporate Disclosure Statements:

TC Ravenswood, LLC ("TC Ravenswood") is a limited liability company organized under the laws of the State of New York and has its principal place of business at 110 Turnpike Road, Westborough, MA, 01581. TC Ravenswood owns and/or leases and operates electric generation facilities in New York and sells energy, capacity, and ancillary services in the wholesale electricity market. TC

iii

Ravenswood does not own any subsidiaries and has not issued any securities to the public. TC Ravenswood is a direct, wholly-owned subsidiary of TransCanada Facility USA, Inc., and an indirect, wholly-owned subsidiary of TransCanada Energy USA, Inc., TransCanada PipeLines Limited, and TransCanada Corporation, a publicly traded Canadian corporation. TransCanada PipeLines Limited is a Canadian public company incorporated in 1951 by a Special Act of Parliament of Canada and continued on June 1, 1979 under the Canada Business Corporations Act.

NRG Power Marketing, LLC is a Delaware limited liability company with its principal office in Princeton, New Jersey, that engages in electric power marketing by placing market bids and entering into bilateral contracts on behalf of generating facilities for the supply and purchase of energy throughout the United States. Arthur Kill Power LLC, Astoria Gas Turbine Power LLC, Dunkirk Power LLC, Huntley Power LLC, and Oswego Harbor Power LLC are each Delaware limited liability companies (with their principal offices also located in Princeton, New Jersey) that own electric generation facilities operating within the service territory of the New York Independent System Operator, Inc. ("NYISO").

NRG Power Marketing LLC, Arthur Kill Power LLC, Astoria Gas Turbine Power LLC, Dunkirk Power LLC, Huntley Power LLC, and Oswego Harbor Power LLC (collectively, the "NRG Companies") are subsidiaries of NRG Energy,

Inc., a publicly held corporation.  At this time, only NRG Energy, Inc. (NYSE: NRG) has issued shares to the public.  The NRG Companies have not issued shares to the public.  BlackRock, Inc. and T. Rowe Price Associates, Inc. own more than 10% of the outstanding shares of NRG Energy, Inc.  No other publicly held company has a 10% or greater ownership interest in NRG Energy, Inc.

WAS:184083.7

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........................................................................... i

CORPORATE DISCLOSURE STATEMENT ........................................... iii

TABLE OF CONTENTS ................................................................ vi

TABLE OF AUTHORITIES ............................................................ ix

GLOSSARY ................................................................................ xv

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT REGARDING ORAL ARGUMENT .................................... 2

STATEMENT OF ISSUES ................................................................ 3

STATUTES AND REGULATIONS ...................................................... 5

STATEMENT OF THE CASE ............................................................ 5

STATEMENT OF FACTS ................................................................ 13

    A.    Background ................................................................ 13

    B.    The Underlying Proceeding ........................................... 16

SUMMARY OF THE ARGUMENT .................................................... 25

STANDING ................................................................................ 30

ARGUMENT .............................................................................. 31

    A.    FERC's Suspension of the Proposed Rates in Excess of its Statutory Authority was Arbitrary and Capricious, and Contrary to Law ................................................................ 33

        1.    The January 28 Order Established the Duration of the Suspension Period .................................................. 34

        2.    The Five-Month Suspension Authority Limitation is a Hard-and-Fast Rule .................................................. 36

        3.    Acceptance of the March 28 Compliance Filing Did Not Supersede the Proposed Rates ........................... 37

        4.    Any Deemed Withdrawal Did Not Comply with Section 35.17 of FERC's Regulations ........................... 40

B.    FERC Erred in Imposing a Maximum Suspension Period ...... 40

    1.    FERC Failed to Offer a Reasoned-Explanation for its Departure from Prior Relevant Precedent and Policy .......................................................................... 42

    2.    FERC's Order was Arbitrary and Capricious Because It Failed to Consider and Address Arguments of Critical Importance to the Suspension Decision ...................................................... 48

C.    FERC's Removal and Substitution of the Escalation Factor from the Pre-existing Rates Violated its Policy against Piecemeal Ratemaking ................................................. 49

D.    FERC Erred in Approving an Escalation Factor Based on General Measures of Consumer Price Inflation Rather than HW Index ...................................................................... 54

    1.    FERC Refused to Provide Any Substantive Explanation for Departing from its Policy to Use the Industry-Specific HW Index to Derive the Escalation Factor .......................................................... 55

    2.    FERC Ignored Substantial Evidence that Establishes that General Measures of Inflation Do Not Accurately Forecast the Cost Increases of Gas Peakers ...................................................................... 58

E.    FERC's Acceptance of Flawed Historic Data Period and Inadequate Statistical Diagnostic Tests to Derive the Projected E&AS Revenues was Arbitrary and Capricious ...... 60

F.    FERC Engaged in Arbitrary and Capricious Decision-making by Eliminating Property Taxes in Calculating the Cost of New Entry During the Demand Curve Reset ............. 64

    1.    FERC Engaged in Arbitrary and Capricious Decision-making by Failing to Follow its Precedent from the *IPPNY Complaint Order* ................ 65

    2.    FERC's Orders Excluding Property Taxes from the Calculation of the Cost of New Entry for Purposes

WAS:184083.7

of Setting the Demand Curve are Arbitrary, Capricious, and Not Based on Substantial Evidence in the Record .................................................. 75

CONCLUSION ........................................................................... 79

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM TABLE OF CONTENTS

WAS:184083.7

# TABLE OF AUTHORITIES

## FEDERAL AND ADMINISTRATIVE CASES

*Algonquin Gas Transmission Co. v. FERC*,
  984 F.2d 1305 (D.C. Cir. 1991) ("*Algonquin*") ..................................... 30, 65, 78

*Am. Gas Ass'n v. FERC*,
  593 F.3d 14 (D.C. Cir. 2010) ("*American Gas*") ......................................... 56, 61

*ANR Pipeline Co. v. FERC*,
  71 F.3d 897 (D.C. Cir. 1995) ......................................................... 11, 32, 41, 47

\* *Astoria Generating Company L.P.*,
  139 FERC ¶ 61,244 (2012) ....................................................................... 53

*AT&T Corp. v. FCC*,
  236 F.3d 729 (D.C. Cir. 2001) ........................................................... 32, 41, 48

\* *Atl. City Elec. Co. v. FERC*,
  295 F.3d 1 (D.C. Cir. 2002) ................................................................... 33, 34

\* *Boston Edison Co.*,
  12 FERC ¶ 61,211 (1980) ("*Boston Edison*") .............................. 42, 43, 44, 45

*Bush-Quayle '92 Primary Comm. v. FEC*,
  104 F.3d 448 (D.C. Cir. 1997) ................................................................... 47

*California Indep. Sys. Operator Corp. v. FERC*,
  372 F.3d 395 (D.C. Cir. 2004) ................................................................... 14

*Canadian Ass'n of Petroleum Producers v. FERC*,
  254 F.3d 289 (D.C. Cir. 2001) ("*CAPP*") .............................................. 49, 60

*Chevron USA, Inc. v. Nat. Res. Def. Counsel*,
  467 U.S. 837 (1984) ..................................................................................... 33

\* *City of Charlottesville v. FERC*,
  661 F.2d 945 (D.C. Cir. 1981) ................................................................... 78

\* Authorities upon which we chiefly rely are marked with asterisks.

ix

\* *City of Idaho Falls, Idaho v. FERC,*
       629 F.3d 222 (D.C. Cir. 2011) ...................................................................... 33, 34

*City of Kaukauna v. FERC,*
       581 F.2d 993 (1978) ........................................................................................ 37

*Consol. Edison Co. of N.Y., Inc. v. FERC,*
       315 F.3d 316 (D.C. Cir. 2003) ........................................................................ 56

*Delmarva Power & Light Co.,*
       48 F.P.C. 1157 (1972) ("Delmarva") ......................................................... 34, 37

*Elec. Consumers Res. Council v. FERC,*
       407 F. 3d 1232 (D.C. Cir. 2005) ("Electricity Consumers") ................. 14, 61, 78

*Exxon Pipeline Co. v. United States,*
       725 F.2d 1467 (D.C. Cir. 1984) ...................................................................... 41

*Farmers Union Cent. Exch., Inc. v. FERC,*
       734 F.2d 1486 (D.C. Cir. 1984) ...................................................................... 44

\* *Great Lakes Transmission Co.,*
       12 FERC ¶ 61,293 (1980) ("Great Lakes") ................................... 42, 43, 44, 45

*Greater Boston Television Corp. v. FCC,*
       444 F.2d 841 (D.C. Cir. 1970) ........................................................................ 47

*Houlton Water Co. v. Me. Pub. Serv. Co.,*
       55 FERC ¶ 61,037 (1991) ................................................................. 12, 21, 52

\* *Indep. Power Producers of New York, Inc. v. New York Indep. Sys.*
   *Operator, Inc.,*
       125 FERC ¶ 61,311 (2008) ("IPPNY" or "IPPNY Complaint Order") ................
       ........................................................... 12, 30, 52, 66, 67, 68, 69

*Indiana & Michigan Elec. Co. v. FPC,*
       502 F.2d 336 (D.C. Cir. 1974) ........................................................................ 37

*Interstate Natural Gas Ass'n of Am. v. FERC,*
       285 F.3d 18 (D.C. Cir. 2002) .......................................................................... 44

x

*Iroquis Gas Transmission Sys., L.P.,*
   80 FERC ¶ 61,213 (1997) ....................................................... 12, 52

*ISO New England Inc.,*
   115 FERC ¶ 61,332 (2006) ..................................................... 74

\* *ISO New England Inc.,*
   131 FERC ¶ 61,065 (2010) ..................................................... 56

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .............................................................. 30, 31

*Maine Pub. Utils. Comm'n v. FERC,*
   454 F.3d 278 (D.C. Cir. 2006) ............................................... 33

*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001) ............................................. 33

*Michigan Consol. Gas Co. v. FERC,*
   883 F.2d 117 (D.C. Cir. 1989) ............................................... 56

*Missouri Pub. Serv. Comm'n v. FERC,*
   601 F.3d 581 (D.C. Cir. 2008) ............................................... 61

*Moraine Pipeline Co. v. FERC,*
   906 F.2d 5 (D.C. Cir. 1990) ("*Moraine*") ................................. 49, 59, 60, 61, 64

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ("*State Farm*") ....................................... 32, 55, 56, 75

*Natural Gas Supply Ass'n,*
   137 FERC ¶ 61,051 (2011) ..................................................... 57

*New York Indep. Sys. Operator, Inc.,*
   111 FERC ¶ 61,117 (2005) ..................................................... 60

\* *New York Indep. Sys. Operator, Inc.,*
   112 FERC ¶ 61,283 (2005) ("2005 NYISO Order") ................. 69

\* *New York Indep. Sys. Operator, Inc.,*
   122 FERC ¶ 61,064 (2008) ("2008 Reset Order") .................. 8, 12, 29, 50, 55

WAS:184083.7

\* *New York Indep. Sys. Operator, Inc.*,
125 FERC ¶ 61,299 (2008) ("2008 Reset Rehearing Order") ................ 8, 28, 55

\* *New York Indep. Sys. Operator, Inc.*,
134 FERC ¶ 61,058 (2011) ("January 28 Order") ................................................
................7, 15, 17, 18, 21, 34, 35, 38, 43, 45, 56, 57, 58, 59, 60, 63, 66, 70, 75

\* *New York Indep. Sys. Operator, Inc.*,
134 FERC ¶ 61,178 (2011) ("March 9 Order") ... 7, 20, 21, 28, 36, 46, 50, 52, 53

\* *New York Indep. Sys. Operator, Inc.*,
135 FERC ¶ 61,002 (2011) ("April 4 Order") ................................... 8, 22, 37, 39

\* *New York Indep. Sys. Operator, Inc.*,
135 FERC ¶ 61,170 (2011) ("May 19 Order") ................................................
......................................................9, 23, 38, 56, 57, 58, 59, 60, 61, 63, 64, 72, 76

*New York Indep. Sys. Operator, Inc.*,
136 FERC ¶ 61,192 (2011) ("September 15 Order") ................................... 8, 24

\* *New York Indep. Sys. Operator, Inc.*,
137 FERC ¶ 61,218 (2011) ("December 15 Order") ................. 24, 25, 38, 73, 77

*New York Indep. Sys. Operator, Inc.*,
Docket No. ER11-2224-010 (issued Oct. 26, 2011) (delegated letter
order) .......................................................................................................... 23

*Ocean State Power II*,
69 FERC ¶ 61,146 (1994) .......................................................................... 51

*Pac. Gas & Elec. Co. v. FERC*,
373 F.3d 1315 (D.C. Cir. 2004) ............................................................. 31, 32

*Panhandle E. Pipe Line Co. v. FERC*,
890 F.2d 435 (D.C. Cir. 1989) .................................................................. 79

\* *PJM Interconnection, L.L.C.*,
129 FERC ¶ 61,090 (2009) ("*PJM*") .......................................................... 56

*PJM Interconnection, L.L.C.*,
131 FERC ¶ 61,168 (2010) .......................................................................... 56

\* *S. Cal. Edison Co. v. FERC*,
    603 F.3d 996 (D.C. Cir. 2010) ................................................................. 33, 34

*SEC v. Chenery Corp.*,
    318 U.S. 80, 88 (1943) ................................................................................. 32

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ............................................................... 30, 31

*Snoqualmie Indian Tribe v. FERC*,
    545 F.3d 1207 (9th Cir. 2008) ...................................................................... 59

*Tennessee Gas Pipeline Co. v. FERC*,
    871 F.2d 1099 (D.C. Cir. 1989) .................................................................... 74

*Trans Alaska Pipeline Rate Cases*,
    436 U.S. 631 (1978) ...................................................................................... 46

*Transmission Access Policy Study Group v. FERC*,
    225 F.3d 667 (D.C. Cir. 2000) ...................................................................... 13

*Valero Interstate Transmission Co. v. FERC*,
    903 F.2d 364 (5th Cir. 1990) ........................................................................ 74

\* *West Texas Utils. Co.*,
    18 FERC ¶ 61,189 (1982) ("*West Texas*") ................................. 27, 44, 45, 46

*Williams Gas Processing-Gulf Coast Co. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) ("*Williams*") ................................... 55, 57, 65

*Wisconsin Valley Improvement Co. v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001) ...................................................................... 57

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 706(2) (2006) .................................................................... 31, 32

16 U.S.C. §§ 791a, *et seq.* (2006) ............................................................ 1

16 U.S.C. § 824d(e) (2006) .................................................... 26, 33, 36, 40

16 U.S.C. § 825I(b) (2006) ........................................................................ 2

WAS:184083.7

18 C.F.R. § 35.17(c) (2011) ............................................................... 27, 40

18 C.F.R. § 385.212 (2011) ................................................................. 71

## OTHER AUTHORITIES

2011 N.Y. Laws Chapter 28 (May 18, 2011) ............................................. 23, 71, 77

Order No. 679, FERC Stats. & Regs. ¶ 31,222 (2006) .................................... 12, 51

Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) .......................................... 13

Order No. 890, FERC Stats. & Regs. ¶ 31,241 (2007) .................................... 11, 51

New York Independent System Operator, Inc., Market Administration and
    Control Area Services Tariff ........................................................ 6, 16

# GLOSSARY

| | |
|---|---|
| April 4 Order: | *New York Indep. Sys. Operator, Inc.,* "Letter Order Accepting Filing to State Currently Effective Installed Capacity Demand Curves and Motion to Withdraw February 17, 2011 Filing," 135 FERC ¶ 61,002 (Apr. 4, 2011) |
| Commission: | Federal Energy Regulatory Commission |
| Compliance Rates: | Revised ICAP demand curve rates filed in the March 29 Compliance Filing |
| CONE: | Cost of New Entry |
| December 15 Order: | *New York Indep. Sys. Operator, Inc.,* "Order on Rehearing," 137 FERC ¶ 61,218 (2011) |
| E&AS Revenues: | Energy and Ancillary Services Revenues |
| FERC: | Federal Energy Regulatory Commission |
| FPA: | Federal Power Act |
| HW Index: | Handy-Whitman Index |
| ICAP: | Installed Capacity |
| In-City Market: | NYISO electricity market that serves New York City |
| IPPNY: | Independent Power Producers of New York, Inc. |
| ISO-NE: | ISO New England Inc. |

WAS:184083.7

ISOs:    Independent System Operators

January 28 Order:    *New York Indep. Sys. Operator, Inc.,* "Order Accepting Tariff Revisions Subject to Modification, Suspending for Five Months, and Directing Compliance Filing," 134 FERC ¶ 61,058 (Jan. 28, 2011)

March 9 Order:    *New York Indep. Sys. Operator, Inc.,* "Order on Requests for Expedited Clarification and Rehearing," 134 FERC ¶ 61,178 (Mar. 9, 2011)

March 28 Compliance Filing:    *New York Indep. Sys. Operator, Inc.,* "Compliance Filing to State Currently Effective ICAP Demand Curves to be Effective April 21, 2011," Docket No. ER11-2224-003 (filed Mar. 28, 2011)

March 29 Compliance Filing:    *New York Indep. Sys. Operator, Inc.,* "Compliance Filing – ICAP Demand Curve Tariff Revisions," Docket No. ER11-2224-004 (filed Mar. 29, 2011)

May 18 Amendment:    Amendment to the NYC property tax laws

May 19 Order:    *New York Indep. Sys. Operator, Inc.,* "Order on Rehearing," 135 FERC ¶ 61,170 (May 19, 2011)

Motion to Lodge:    NYPSC and City of New York, *Motion to Lodge and for Expedited Ruling on an Amendment to the New York Real Property Tax Law to Provide Tax Abatements for Peaking Generating Facility by the City of New York and the New York Public Service Commission,*

WAS:184083.7

| | |
|---|---|
| | Docket No. ER11-2224-000, *et al.* (filed on May 18, 2011) |
| NERA: | National Economic Research Associates, Inc., witness/consultant for NYISO in the underlying proceeding |
| Net CONE: | Net Cost of New Entry |
| November 30 Filing: | *New York Indep. Sys. Operator, Inc.,* "Tariff Revisions to Implement Revised ICAP Demand Curves for Capability Years 2011/2012, 2012/2013 and 2013/2014," Docket No. ER11-2224-000 (filed Nov. 30, 2010) |
| NRG Companies: | NRG Power Marketing LLC, Arthur Kill Power LLC, Astoria Gas Turbine Power LLC, Dunkirk Power LLC, Huntley Power LLC, and Oswego Harbor Power LLC |
| NYC: | New York City |
| NYC Suppliers: | New York City Suppliers consist of Astoria Generating Company, L.P., TC Ravenswood, and the NRG Companies in the underlying proceeding |
| NYISO: | New York Independent System Operator, Inc. |
| NYPSC: | New York Public Service Commission |
| Petitioners: | TC Ravenswood and NRG Companies |
| PJM: | PJM Interconnection, L.L.C. |

xvii

Pre-existing Rates:              ICAP demand curve rates designed for
                                 capability year 2010/2011

Proposed Rates:                  ICAP demand curve rates filed in the
                                 November 30 Filing and suspended in
                                 the January 28 Order

Regression Model:                Economic price regression model used
                                 to calculate E&AS Revenues

Services Tariff:                 NYISO Market Administration and
                                 Control Area Services Tariff

TC Ravenswood:                   TC Ravenswood, LLC

WAS:184083.7

## JURISDICTIONAL STATEMENT

The NRG Companies and TC Ravenswood (collectively, "Petitioners") seek review of the following orders issued by the Federal Energy Regulatory Commission ("Commission" or "FERC") pursuant to the Federal Power Act ("FPA")[1] to establish prices for capacity in the New York Independent System Operator, Inc.'s ("NYISO") market that serves New York City ("In-City Market" or "NYC"). The orders are: (i) *New York Indep. Sys. Operator, Inc.*, "Order Accepting Tariff Revisions Subject to Modification, Suspending for Five Months, and Directing Compliance Filing," 134 FERC ¶ 61,058 (Jan. 28, 2011) ("January 28 Order"), amended by *New York Indep. Sys. Operator, Inc.*, "Errata Notice," (Feb. 17, 2011); (ii) *New York Indep. Sys. Operator, Inc.*, "Order on Requests for Expedited Clarification and Rehearing," 134 FERC ¶ 61,178 (Mar. 9, 2011) ("March 9 Order"); (iii) *New York Indep. Sys. Operator, Inc.*, "Letter Order Accepting Filing to State Currently Effective Installed Capacity Demand Curves and Motion to Withdraw February 17, 2011 Filing," 135 FERC ¶ 61,002 (Apr. 4, 2011) ("April 4 Order"); (iv) *New York Indep. Sys. Operator, Inc.*, "Order on Rehearing," 135 FERC ¶ 61,170 (2011) ("May 19 Order"); and (v) *New York Indep. Sys. Operator, Inc.*, "Order on Rehearing," 137 FERC ¶ 61,218 (Dec. 15,

---

[1]    16 U.S.C. §§ 791a, *et seq.* (2006).

1

2011) ("December 15 Order").[2]   FERC denied Petitioners' timely requests for rehearing in the March 9, May 19 and December 15 Orders.   Thus, Petitioners are seeking review of final orders issued by FERC.   This Court has jurisdiction to review FERC's final orders under FPA Section 313(b).[3]   TC Ravenswood and NRG Companies each timely filed petitions for review with this Court on January 6, 2012 and February 9, 2012, respectively, well within the required sixty days of the December 15 Order.[4]   Accordingly, jurisdiction of this Court is appropriately established to resolve the issues presented herein.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument has not yet been scheduled in this case.   Petitioners respectfully request the opportunity to present oral argument.   This case arises from FERC's disregard of explicit statutory standards of the FPA that place limits on its ability to suspend proposed rates, as well as its own related legal standards. FERC also departed from its policy that bars piecemeal ratemaking, as well as standards relevant to determining a just and reasonable rate.   FERC's orders provide no reasoned explanation for its anomalous rulings.   The consequence of FERC's errors is that entities that supply capacity into NYISO's In-City Market

---

[2]   TC Ravenswood seeks review of all five orders; the NRG Companies seek review of (i), (iv) and (v).

[3]   *Id.* § 825I(b).

[4]   *Id.*

2

are denied the opportunity to recover their costs and earn a reasonable return in violation of the most basic tenant of ratemaking. The orders at issue involve the complex operations of NYISO's organized electric market that is intended to operate as a proxy for a competitive market, albeit within the strictures of regulatory policies underlying the FPA. Petitioners believe oral argument would assist the Court in resolving the issues presented on appeal.

## STATEMENT OF ISSUES

1. Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, abused its discretion, or acted contrary to law by suspending the Proposed Rates in excess of the maximum five-month period established by FPA Section 205(e).

2. Whether even a suspension of the Proposed Rates for the maximum five-month period was unwarranted here and whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by failing to (a) suspend the Proposed Rates for a nominal period of one day only, consistent with its current precedent and suspension policy to employ a one-day suspension except in limited circumstances not applicable here, (b) support its bald assertion of extraordinary circumstances, and (c) respond to arguments regarding the

3

impact of its suspension decision on capacity sellers, including Petitioners.

3. Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by failing to provide any substantive explanation for departing from its policy against piecemeal ratemaking by directing NYISO to extend the Pre-existing Rates during the suspension period *without* the 7.8% escalation factor FERC previously approved as an integral component of those rates.

4. Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by failing to provide any substantive explanation for departing from its policy and precedent to derive the escalation factor from the industry-specific Handy-Whitman Index, and by ignoring substantial evidence that established that general measures of consumer price inflation used by NYISO to derive the escalation factor *bore no relation* to cost increases of gas turbine peakers in the NYISO installed capacity market.

5. Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion by accepting the flawed historic data period and inadequate statistical tests NYISO used to

4

derive energy and ancillary services revenue projections in spite of uncontroverted record evidence that established that flawed historic data and inadequate statistical tests produce inaccurate energy and ancillary services revenue projections, and by refusing to consider proposed solutions to correct the accuracy of the projections.

6. Whether FERC acted arbitrarily and capriciously, failed to engage in reasoned decision-making, or abused its discretion when, contrary to its prior precedent of refusing to adjust the demand curve to reflect a change in a single component (*i.e.*, property taxes), it excluded property taxes from the calculation of the cost of new entry for the proxy peaking unit that is used to establish the demand curve and rate for the sale of capacity in NYC in response to a change in the property tax law (*i.e.*, a single component) and did so based on general conclusory statements without record evidence.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Statutory Addendum attached hereto.

## STATEMENT OF THE CASE

NYISO's Market Administration and Control Area Services Tariff ("Services Tariff") requires NYISO triennially to propose the parameters of certain

WAS:184083.7

demand curves.   Those demand curves are used in conjunction with monthly auctions to establish the prices suppliers will receive when they sell their capacity into the markets operated by NYISO.

Capacity is the "capability to generate . . . electrical power . . . measured in megawatts."[5]   Suppliers selling capacity effectively are selling a day-ahead call option for energy to the market for the specified amounts of megawatts up to a maximum amount determined by a Dependable Maximum Net Capability test.  All other things being equal, a demand curve based on higher values will produce higher capacity prices; a demand curve based on lower values will produce lower prices.  Further, consistent with basic economics, the intent underlying the demand curves is that the greater the amount of low-cost capacity offered in an auction, the lower capacity prices.

In accordance with the triennial "reset" process required by NYISO's Services Tariff, NYISO filed updated demand curves with FERC on November 30, 2010 ("Proposed Rates"), to be effective January 28, 2011 for capability years 2011/2012, 2012/2013 and 2013/2014 ("November 30 Filing").   Rates for the preceding capability year, 2010/2011 (the "Pre-existing Rates"), were set to expire April 30, 2011.

---

[5]    Services Tariff, § 2.3.

6

In an order issued January 28, 2011, FERC accepted NYISO's November 30 Filing, with certain modifications, but suspended the Proposed Rates for the maximum period of five months until June 28, 2011.[6] By ordering the five-month suspension, FERC required that the Pre-existing Rates, which were set to expire April 30, 2011, would remain in effect during the suspension period, *i.e.*, through June 28, 2011 to fill the gap that otherwise would exist between May 1 and June 28 2011.[7] FERC also ordered NYISO to make a compliance filing to modify the Proposed Rates consistent with FERC's rulings on individual factors that set the parameters of the demand curves, the effect of which required NYISO to develop revised demand curves based on higher values than the demand curves underlying the Proposed Rates.[8] However, FERC stated that "due to the difficulties of implementing revised demand curves in mid-season, NYISO should indicate in its compliance filing the date it anticipates implementing the new demand curves"[9] but "[s]uch a date should be no later than November 1, 2011."[10] Subsequently, on April 4, 2011, FERC ruled that the Pre-existing Rates should remain in effect beyond the five month suspension period, *i.e.,* beyond June 28, 2011, and tied the

---

[6]    January 28 Order at P 168.

[7]    *Id.*; *see also* March 9 Order at P 18.

[8]    January 28 Order at PP 53, 88-90, 144, 140.

[9]    *Id.* P 168.

[10]   *Id.*

7

date the Pre-existing Rates would remain in effect to the date NYISO implemented the revised demand curves required by the January 28 Order.[11] By authorizing the Pre-existing Rates to remain in effect beyond June 28, 2011, FERC effectively suspended the Proposed Rates for a period in excess of five months in violation of the statutory restriction that limits FERC's authority to suspend rates to no more than five months.  FERC accepted NYISO's rates made in compliance with the January 28 Order ("Compliance Rates"), as subsequently revised, and put them into effect, September 15, 2011.[12]

Thus, the Proposed Rates never were put into effect.  Rather, FERC kept the Pre-existing Rates in effect for a period of seven-and-a-half months after it suspended the Proposed Rates.  Following the seven-and-a-half-month period, FERC put the Compliance Rates into effect subject to one major revision that will be discussed *infra*.

The issues in this case thus revolve around three distinct sets of rates:  (1) the Pre-existing Rates that FERC approved in an order issued in 2008 and which by their terms were supposed to expire until April 30, 2011,[13] but which FERC

---

[11]    April 4 Order at P 10.

[12]    *New York Indep. Sys. Operator, Inc.*, 136 FERC ¶ 61,192, at P 86 (2011) ("September 15 Order").

[13]    *New York Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,064 ("2008 Reset Order"), *order on reh'g*, 125 FERC ¶ 61,299 (2008) ("2008 Reset Rehearing

extended until September 15, 2011; (2) the Proposed Rates that NYISO proposed on November 30, 2010, to be effective January 28, 2011, which FERC suspended until a date no later than June 28, 2011, *i.e.*, 5 months from their proposed effective date; and (3) the Compliance Rates that are the Proposed Rates as modified by NYISO's compliance filing to comply with the revisions required by the January 28 Order, which FERC had directed be implemented no later than November 1, 2011, and which FERC ultimately put into effect on September 15, 2011, *i.e.*, two-and-a-half months after the expiration of the five-month suspension period.[14] The particular aspect of each of these rates that is involved in this appeal is the rate for capacity in NYISO's In-City Market, *i.e.*, the market serving NYC.

Petitioners will show herein that FERC exceeded its statutory authority by suspending the Proposed Rates for a period in excess of five months in violation of FPA Section 205(e). They also will show that FERC failed to engage in reasoned decision-making by initially ordering that the Proposed Rates be suspended for the maximum five-month period, rather than for a nominal period of one day. Petitioners finally will show that FERC also failed to engage in reasoned decision-making by ruling in contradiction of its policies and precedent, and without

---

Order"); *see also* NYISO Tariff Filing, Docket No. ER08-283-000, at 40 (filed Nov. 30, 2007).

[14] The Compliance Rates also reflect a significant change that FERC required in its May 19 Order. May 19 Order at P 43.

9

substantial evidence, in adopting certain parameters that established the shape of the demand curve for the In-City Market.

FPA Section 205(e) provides in pertinent part that FERC "may suspend the operation of [a rate] and defer the use of such rate, . . . but not for a longer period than five months. . . ." The fact that FERC required the Pre-existing Rates to remain in effect for seven-and-a-half months after the proposed effective date of the Proposed Rates unambiguously shows FERC exceeded its authority by suspending the Proposed Rates for longer than five months. FERC's putative reason for doing so cannot be squared with the plain language of FPA Section 205(e).

Further, consistent with its precedent and policy and the evidence in this case, FERC should have suspended the Proposed Rates for one day only, not for the maximum period. Under certain circumstances where a proposed rate is significantly higher than the just and reasonable rate, FERC will suspend the proposed rate for the maximum period. In such circumstances, FERC suspends the proposed rate to protect ratepayers, for the maximum legally authorized period, from paying significantly excessive amounts. However, here, the Pre-existing Rates were lower than the Proposed Rates, which were lower than the just and

10

reasonable rates ordered by FERC in its January 28 Order.[15]   Accordingly, the

Proposed Rates were too low to be just and reasonable, and the Pre-existing Rates

were even lower.   Therefore, no ratepayer would have been harmed by paying the

Proposed Rates, which were at least a step in the right direction toward the rates

FERC itself found to be just and reasonable.   However, by leaving the Pre-existing

Rates in effect, FERC directly harmed suppliers by suppressing capacity prices far

below the just and reasonable rate.   Accordingly, by suspending the Proposed

Rates for the maximum period and leaving the *lower* Pre-existing Rates in effect,

FERC exacerbated rather than alleviated an unjust and unreasonable result.   In

doing so, FERC failed to follow its precedent without offering any explanation for

its departure from its own policy.[16]

Further complicating matters, FERC declined to escalate the Pre-existing

Rates during the suspension period, freezing the rates at their then-current level.

---

[15]   In its May 19 Order, FERC reversed the ruling it made in its January 28 Order concerning property taxes. This issue is discussed at length *infra* commencing at page 64.  The effect of that reversal was to make the Proposed Rates lower than the rates FERC ultimately found to be just and reasonable in the May 19 Order.  However, because the reversal did not occur until May 19, 2011, the effect of that change is irrelevant to the propriety of FERC's ruling on the suspension issue four months earlier in the January 28 Order during which time the Proposed Rates were lower than the rate FERC had found to be just and reasonable as discussed above.  Furthermore, Petitioners show *infra* that FERC erred in reversing its earlier ruling regarding property taxes.

[16]   *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) (citations omitted).

11

An integral component of the Pre-existing Rates were an annual escalation factor of 7.8%.[17]  Thus, when FERC decided to leave the Pre-existing Rates in effect through the suspension period, effective May 1, 2011, when the rate otherwise would have expired, the rates should have been increased by 7.8%.  FERC's refusal to escalate the Pre-existing Rates further exacerbated the continuance of unjust and unreasonable rates, was in contradiction of FERC's order that originally established the Pre-existing Rates in 2008, and violated FERC's policy against piecemeal ratemaking.[18]

FERC also compounded these errors by issuing other rulings that inappropriately set the demand curve below the level supported by the evidence and prior FERC precedent.  For example, less than 24 hours after the New York State Legislature enacted a new law, without waiting for comments from parties on the substance of that legislation, FERC modified its January 28 Order by reducing the demand curve by eliminating property taxes from the determination of the cost

---

[17]  *See* 2008 Reset Order at PP 54-55 (accepting NYISO's proposed annual escalation rate of 7.8% as part of NYISO's revised tariff).

[18]  *See* Order No. 679, FERC Stats. & Regs. ¶ 31,222, at P 23 (2006) ("Order No. 679") (subsequent history omitted); Order No. 890, FERC Stats. & Regs. ¶ 31,241, at P 767 (2007) ("Order No. 890") (subsequent history omitted); *Indep. Power Producers of New York, Inc. v. New York Indep. Sys. Operator, Inc.*, 125 FERC ¶ 61,311, at P 33 (2008) ("*IPPNY*" or "*IPPNY Complaint Order*"); *Houlton Water Co. v. Maine Pub. Serv. Co.*, 55 FERC ¶ 61,037, at 61,110 (1991); *see also Iroquis Gas Transmission Sys., L.P.*, 80 FERC ¶ 61,213, at 61,845 (1997).

12

of new entry for a proxy peaking unit and therefore the compensation suppliers would receive for selling capacity.

Thus, what is at issue in this case are a number of rulings FERC made, the effect of which was to suppress capacity prices in the In-City Market. Some of those rulings were made in disregard of the strictures of FPA Section 205(e). Other rulings were made in violation of FERC policy and precedent. And other rulings were made without support of substantial evidence. On whole, FERC's orders reflect derogation of its duties to: balance the interests of public utilities and ratepayers; authorize only just and reasonable rates; and provide public utilities a reasonable opportunity to recover their costs inclusive of a fair return.

## STATEMENT OF FACTS

### A. Background

Through a series of decisions, this Court is well aware of FERC's efforts to introduce competition in electric markets.[19] As part of those efforts, in Order No. 888,[20] FERC encouraged public utilities to participate in Independent System

---

[19] *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 683-84 (D.C. Cir. 2000), *aff'd sub nom.*, *New York v. FERC*, 535 U.S. 1 (2002).

[20] Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (subsequent history omitted).

13

Operators ("ISOs").  ISOs are independent of market participants and control operation of transmission facilities across a wide-region.[21]

In addition to operating regional grids, ISOs typically operate regional markets for the sale of electric energy and capacity.  Under this structure, FERC intended ISOs to play the role of fair and balanced arbiters between buyers and sellers, acting as clearing houses in which the transactions take place, with no direct financial stake in the markets themselves.  Thus, ISOs are supposed to be financially indifferent to market results and have an interest only in whether the markets are operating on a competitive basis.

To facilitate the functioning of the organized markets, FERC established a system under which an ISO files a tariff setting forth the rates and terms of service applicable to transactions made through the ISO's markets.  Accordingly, unlike the system in place prior to the advent of ISOs, the specific rates for energy, capacity or ancillary services received by public utilities, such as generators that participate in an ISO's markets, generally are not set forth in generators' own rate schedules, but rather are set forth in the ISO's tariff.  As such, a public utility generator must protest the rates an ISO proposes should be paid to the generator if

---

[21] *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 396-97 (D.C. Cir. 2004).

14

the generator does not believe the ISO's proposal will provide it the opportunity to recover its costs and earn a reasonable return.

Of particular relevance here is NYISO's installed capacity or "ICAP" market.    In 2003, NYISO implemented a capacity market centered on administratively determined demand curves, which this Court approved in *Electricity Consumers Resource Council v. FERC*, 407 F. 3d 1232 (D.C. Cir. 2005) ("*Electricity Consumers*").    The demand curves define the monthly price for capacity depending on the amount of capacity offered in each month.  NYISO creates a separate ICAP demand curve for each of its three ICAP zones which is effective for a capability year.  Essentially, the demand curve establishes a formula under which the market clearing price is determined by the amount of capacity offered.[22]  The demand curves are used to determine price in monthly spot market auctions.[23]

NYISO develops the demand curves for its zones based on the net cost of new entry ("Net CONE") of a proxy peaking electric generation unit, which essentially reflects development costs offset by anticipated energy and ancillary services revenues ("E&AS Revenues").

---

[22]    January 28 Order at P 3.

[23]    *Id.*

15

Section 5.14.1.2 of NYISO's Services Tariff requires NYISO to determine the parameters of the demand curves triennially and file proposed demand curves to seek FERC's approval of the proposed demand curves and proposed rates for a corresponding three-year period. Thus, the demand curves are "reset" every three years with the base capability year using Net CONE, and an escalation factor is applied to establish the rate for each of the succeeding two years of the three-year reset period.[24] Net CONE constitutes the cost of the proxy peaking unit less the E&AS Revenues.[25] Prior to the underlying proceeding, NYISO last submitted demand curves on November 30, 2007, to be effective May 1, 2008 and expire on April 30, 2011.[26]

## B.    The Underlying Proceeding

NYISO submitted the November 30 Filing with FERC to replace the expiring Pre-existing Rates. NYISO's filing was designed to enable NYISO to implement the Proposed Rates beginning on May 1, 2011, immediately following the expiration of the Pre-existing Rates. Thus, the November 30 Filing sought to make the updated demand curves effective in time for the commencement of the 2011/2012 capability year.

---

[24]  For a more complete description of the process of developing the demand curves, *see* NYISO November 30 Filing at 5-23.

[25]  Services Tariff, § 23.2.1.

[26]  NYISO Tariff Filing, Docket No. ER08-283-000, at 40 (filed Nov. 30, 2007).

WAS:184083.7

On January 28, 2011, FERC accepted NYISO's November 30 Filing, and suspended the Proposed Rates "to become effective *the earlier* of June 28, 2011, or a date set by a subsequent Commission order in this proceeding"[27] and directed that "the currently effective demand curves will remain in effect until superseded."[28]  The January 28 Order went on to say that "due to the difficulties of implementing revised demand curves in mid-season, NYISO should indicate in its compliance filing the date it anticipates implementing the new demand curves"[29] but "[s]uch a date should be no later than November 1, 2011."[30]

In its January 28 Order, FERC found that the Proposed Rates may be unjust and unreasonable.  However, in contrast to a typical proceeding in which the basis for such a finding is that a proposed rate is excessive, the basis for FERC's finding here was that NYISO's proposal understated, rather than overstated, Net CONE such that the Proposed Rates were less than the just and reasonable rate suppliers were entitled to in payment for their capacity.  In this regard, every determination FERC made in the January 28 Order either upheld a component proposed by

---

[27]  January 28 Order at P 168 (emphasis added).

[28]  *Id.*

[29]  *Id.*

[30]  *Id.*

NYISO as part of its proposed demand curve or required an upward revision to those components.[31]

One important upward revision FERC required concerned property taxes. As part of its November 30 Filing, NYISO excluded property taxes from its calculation of Net CONE, *i.e.*, NYISO assumed the proxy peaking unit would not have to pay property taxes, but FERC rejected that assumption. Thus, FERC directed NYISO to submit a compliance filing revising the Proposed Rates to reflect the proxy unit's payment of property taxes and the other upward revisions to the proposed demand curves FERC required in its January 28 Order. Accordingly, the Pre-existing Rate for NYC was lower than the Proposed Rate, which was lower than the just and reasonable rate FERC required NYISO to file, *i.e.*, the Compliance Rate.

---

[31]  FERC concluded that NYISO needed to revise, or further support, the Proposed Rates:  (1) to reflect the cost of System Deliverability Upgrades, *id.* P 53; (2) to include property taxes in the calculation of Net CONE because property taxes are legitimate costs to generators and the grant of any abatement of such taxes was discretionary, *id.* PP 88-90; (3) to include the levels of average excess capacity adjustments, *id.* P 114; and (4) to accurately reflect the cost of System Upgrade Facilities or provide additional support to the proposed figures that FERC found to be unrealistically low, *id.* P 140.

18

The following graph shows the relationship of the three sets of rates (summer reference points in NYC) that are involved in this appeal:[32]



Because the Pre-existing Rate was lower than the Proposed Rate, which was lower than the Compliance Rate, FERC had no need to protect ratepayers from paying excessive amounts by paying the Proposed Rates. However, FERC needed to protect suppliers by enabling them to collect the Proposed Rate until the higher Compliance Rates could be filed and made effective.

---

[32]   Sources:   NYISO November 30 Filing at 18; NYISO March 29 Compliance Filing, Attachment 1, at 1.

19

TC Ravenswood and NYISO initially submitted timely requests for rehearing and/or clarification of the January 28 Order and requested expedited review. NYISO requested clarification concerned FERC's ruling that the Pre-existing Rates would remain in effect, questioning whether it should escalate the Pre-existing Rates by the 1.7% escalation factor FERC approved in the January 28 Order with respect to the Proposed Rates.[33] TC Ravenswood also argued that the Pre-existing Rate should be escalated by the 7.8% factor FERC approved in 2008 as an integral component of the Pre-existing Rate. TC Ravenswood argued that FERC erred in suspending the proposed NYC rate for the maximum period, and doing so inappropriately continued a rate that was below the just and reasonable rate. TC Ravenswood maintained that the suspension period should be reduced to a nominal period of one day.[34]

In response to those requests for expedited review, FERC ruled that "the [Pre-existing Rates] are to remain in effect without adjustment" because NYISO could not use a component of the Proposed Rates, the escalation factor, and apply it to the extended Pre-existing Rates during the suspension period.[35] FERC ruled that applying the escalation factor would violate FERC's policy against piecemeal

---

[33] NYISO February 9, 2011 Request for Expedited Clarification at 3.

[34] TC Ravenswood February 7, 2011 Request for Rehearing at 7 (citation omitted).

[35] March 9 Order at P 16.

20

ratemaking.[36]  FERC further found that "it was reasonable to suspend the [P]roposed [R]ates until *the earlier of* a date set by the Commission in an order accepting revised rates that comply with the January 28, 2011 Order [(*i.e.*, the Compliance Rates)], or five months."[37]

To comply with the January 28 Order, NYISO submitted two separate filings.  The first compliance filing submitted on March 28, 2011 ("March 28 Compliance Filing") proposed revisions to the Services Tariff to prevent the expiration of the Pre-existing Rates on April 30, 2011 in accordance with the January 28 Order's directive that the "currently effective demand curves will remain in effect until superseded."[38]  The second compliance filing submitted on March 29, 2011 ("March 29 Compliance Filing") proposed the revisions to the Proposed Rates FERC ordered in the January 28 Order.  Those Compliance Rates were to replace the Pre-existing Rates or Proposed Rates as applicable, once FERC accepted them.

The NYC Suppliers (an *ad hoc* coalition which included Petitioners) protested NYISO's March 28 Compliance filing.  They argued that the March 28 Compliance Filing did not comply with the January 28 Order's suspension

---

[36]  *Id.* (citing *Houlton Water Co.*, 55 FERC ¶ at 61,110).

[37]  *Id.* P 18 (emphasis in original).

[38]  January 28 Order at P 168.

21

language because it would keep the Pre-existing Rates in effect until the Compliance Rates went into effect even if the effective date was beyond the maximum suspension period. FERC rejected the protest and accepted the March 28 Compliance Filing to keep the Pre-existing Rates in effect until the effective date of the Compliance Rates even if that were beyond the end of the suspension period.[39]

In addition to the expedited requests for rehearing and/or clarification, several parties submitted requests for rehearing of substantive aspects of the January 28 Order. The NYC Suppliers challenged FERC's rulings that accepted an escalation rate based on general price indices to measure inflation in the electric industry and E&AS Revenues derived from the NYISO's "Regression Model." NYISO and others challenged FERC's ruling to include property taxes in calculating Net CONE.

TC Ravenswood also submitted a request for rehearing of the March 9 Order's decision to uphold the suspension of the Proposed Rates for the maximum period.

On May 19, 2011, FERC issued an order addressing the requests for rehearing of the January 28 Order that were not addressed in the March 9 Order, as well as requests for rehearing of the March 9 Order. In that Order, FERC denied

---

[39]   April 4 Order at P 10.

WAS:184083.7

rehearing of the January 28 Order's rulings on the escalation factor and the E&AS Revenues derived from the Regression Model, but granted rehearing on the property tax issue.

On the property tax issue, FERC ruled Net CONE for NYC should reflect an assumption that the proxy unit will receive full tax abatement.[40]  In reversing its prior determination, FERC relied upon a change in the law enacted less than 24 hours before FERC issued the May 19 Order.[41]

In response to TC Ravenswood's suspension arguments on rehearing of the March 9 Order, FERC ruled that its acceptance of the March 28 Compliance Filing in the April 4 Order rendered the Proposed Rates "moot" and the June 28, 2011 date "irrelevant" because the extended Pre-existing Rates "superseded" the Proposed Rates.[42]  FERC further stated that "NYISO may defer implementation of the revised [C]ompliance [R]ates . . . beyond June 28, 2011"[43] and "action on compliance can occur at any time without conflict with section 205 suspension authority."[44]

---

[40]  May 19 Order at P 41.

[41]  *Id.* (citing 2011 N.Y. Laws Chapter 28 (May 18, 2011)).

[42]  *Id.* PP 104-105.

[43]  *Id.* P 105.

[44]  *Id.* P 104.

WAS:184083.7

The May 19 Order's determination that the Proposed Rates were rendered "moot" and the suspension period "irrelevant," and that NYISO should assume tax abatement treatment generated several requests for rehearing. However, on September 15, 2011, FERC accepted the Compliance Rates, as revised by the May 19 Order, which NYISO implemented on September 22, 2011 for the October 2011 capacity spot market auctions.[45]

Further, on December 15, 2011, FERC rejected the requests for rehearing of the May 19 Order. FERC held the parties were incorrect in believing that NYISO made the March 28 Compliance Filing in compliance with the January 28 Order's directives, ruling NYISO made the filing "unilaterally" and "of its own volition only to prevent a potential gap in rates from occurring starting May 1, 2011, due to the suspension of its November 30, 2010 Filing" and, thus, "[t]he March 28, 2011 Filing was not . . . a filing to comply with a condition of acceptance of the [Proposed Rates]."[46] FERC further held that its reversal on the tax abatement issues was not a departure from Commission precedent barring out-of-cycle adjustments to demand curves[47] but was "in response to changed circumstances

---

[45]  September 15 Order at P 86; *New York Indep. Sys. Operator, Inc.*, Docket No. ER11-2224-010 (issued Oct. 26, 2011) (delegated letter order).

[46]  December 15 Order at PP 11, 39.

[47]  *Id.* PP 25-29.

brought to its attention on rehearing"[48] and that its interpretation of the New York State law was correct.[49]  In interpreting the New York legislation, FERC found, contrary to NYC Suppliers' assertions, that the legislation provided tax abatement "as-of-right"[50] and that NYC Suppliers erred in asserting that "'a significant number of new peaking units' would be ineligible for tax abatement."[51]

## SUMMARY OF THE ARGUMENT

Petitioners submit that FERC erred in the orders under review in six respects by:  (1) unlawfully suspending NYISO's Proposed Rates in excess of five months; (2) imposing a maximum suspension period without articulating a reasoned explanation for its departure from prior precedent and policy, abusing its discretion by arbitrarily imposing the maximum suspension period and failing to respond to parties' arguments; (3) violating its policy against piecemeal ratemaking by eliminating the 7.8% escalation factor from the Pre-existing Rates when it extended them beyond April 30, 2011; (4) ignoring uncontroverted record evidence that general measures of consumer price inflation used by NYISO to derive the escalation factor do not accurately measure cost increases of gas turbine peakers and failing to provide a substantive explanation for departing from its policy and

---

[48]   *Id.* P 27.

[49]   *Id.* PP 33-36.

[50]   *Id.* P 35.

[51]   *Id.*

25

precedent to derive the annual escalation factor from the industry-specific Handy-Whitman Index ("HW Index"); (5) approving inaccurate projected E&AS Revenues derived from the flawed Regression Model, and refusing to consider proposed solutions to correct the accuracy of the projected E&AS Revenues; and (6) assuming without substantial evidence that a NYC tax abatement program will apply to any new peaking unit in NYC and violating its precedent on piecemeal ratemaking.  For these reasons, this Court should vacate the orders under review and remand the matter to FERC for further proceedings.

With regard to the first issue, FERC was barred by FPA Section 205 from suspending the Proposed Rates for a period in excess of five months.  Thus, by keeping the Pre-existing Rates in effect past June 28, 2011, FERC violated FPA Section 205(e).[52]  Furthermore, there is no substance to the legal fiction FERC tried to create to justify keeping the Pre-existing Rates in effect past June 28, 2011.  FERC contended that NYISO withdrew the Proposed Rates, *i.e.*, it withdrew its November 30 Filing, thereby effectively mooting the applicability of FPA Section 205(e) and the five-month suspension period.  However, NYISO never withdrew the Proposed Rates nor could the November 30 Filing that proposed those rates be "withdrawn" as FERC claimed because the withdrawal would have been in

---

[52]   16 U.S.C. § 824d(e) (2006).

contradiction of FERC's regulations and would have rendered the entire compliance proceeding "moot."[53]

On the second issue, FERC's imposition of the maximum suspension represents an unexplained departure from prior precedent and policy. In reaching the decision to suspend the Proposed Rates for the maximum period, FERC relied on precedent that is readily distinguishable and has not been Commission policy for over thirty years. Had FERC applied its consistently employed suspension policy of the last 30 years,[54] the outcome would have been a suspension of one day rather the maximum five-month suspension. Furthermore, regardless what standard FERC applied, it was clear that its suspension order did not address any harm to ratepayers. Rather, it imposed harm on suppliers by suppressing capacity prices below the just and reasonable level.

On the third issue, FERC directed NYISO to extend the Pre-existing Rates without escalation into capability year 2011/2012. ICAP demand curve rates are based upon an integrated set of inputs established for an initial year, which are escalated thereafter by a FERC approved escalation factor to establish rates for subsequent years. The integrated inputs and escalation factor *together* constitute a single rate and without escalation from year-to-year, the rate is unjust and

---

[53] 18 C.F.R. § 35.17(c) (2011).

[54] *West Texas Utils. Co.*, 18 FERC ¶ 61,189 (1982) ("*West Texas*").

unreasonable. However, rather than applying the 7.8% escalation factor that was an integral component of the rate, FERC eliminated the escalation factor when it extended the rate.[55]   Altering the rate formula in that manner violated FERC's policy against piecemeal ratemaking.

On the fourth issue, FERC failed to provide any substantive explanation for its departure from prior relevant precedent and policy when it accepted the use of general measures of consumer price inflation rather than the industry-specific HW Index to derive the appropriate escalation factor to be applied to the Compliance Rates for succeeding years. FERC ignored substantial evidence that established that general measures of inflation do not accurately forecast the rate of inflation of the costs of gas peaking units that were used to calculate the costs of the proxy unit to derive Net CONE. In prior proceedings involving demand curve resets for NYISO, as well as other ISOs, FERC found that an escalation factor derived from the HW Index to be reasonable because it "accounts for all elements of engineering, procurement, and construction costs . . . [and] is specifically tailored to the [electric] industry, is widely used by the industry and thus is an appropriate data source. . . ."[56]   It also specifically rejected the use of general measures of

---

[55]   March 9 Order at P 16.

[56]   2008 Reset Rehearing Order at P 35.

WAS:184083.7

inflation to derive the escalation factor.[57]  FERC's use of a general measure of inflation here without offering any substantive explanation for its departure from that precedent, or reasons why general measures would be superior to industry-specific measures, was arbitrary and capricious.

With regard to the fifth issue, FERC erroneously relied upon a flawed historic data period and inadequate statistical tests to determine the justness and reasonableness of the projected E&AS Revenues, which directly impacts the demand curves by lowering Net CONE for the proxy peaking unit.  In particular, NYISO's Regression Model contained two fundamental flaws.    First, the Regression Model's parameters were too short (*i.e.*, three years) to accurately predict the E&AS Revenues.   Second, NYISO's consultant, NERA, did not use basic statistical tests to ensure the accuracy of the Regression Model's projections.  In fact, NERA's witness did not dispute, and even agreed with, a number of the problems with the data and the model.[58]  The flawed Regression Model led to the overstatement of the E&AS Revenues and erroneously lowered the demand curve rates.   Accepting the E&AS Revenues in the face of the flawed data and model violates FERC's obligation to engage in reasoned decision-making.

---

[57]   2008 Reset Order at P 54.

[58]   *See* Carlson Supplemental Aff. at PP 7-15.

29

With regard to the sixth issue, FERC made two errors. First, FERC failed to follow its precedent from *IPPNY*.[59] More specifically, FERC engaged in piecemeal ratemaking by looking at only one component of the generator's cost (a change in property tax laws) after its approval of the demand curve. Second, even assuming that it was appropriate to look at one cost component, FERC lacked an adequate record to re-examine that issue and its decision contained "general and conclusory" statements lacking record support.[60]

## STANDING

The "'irreducible constitutional minimum of standing contains three elements: (1) injury-in-fact, (2) causation, and (3) redressibility."[61] When reviewing an administrative agency decision, as is the case in the instant proceeding, this Court has noted that "if the complainant is 'an object of the action (or forgone action) at issue' - as is the case usually in review of a rulemaking and nearly always in review of an adjudication - there should be 'little question that the

---

[59]    125 FERC ¶ 61,311.

[60]    *Algonquin Gas Transmission Co. v. FERC*, 984 F.2d 1305, 1312 (D.C. Cir. 1991) ("*Algonquin*").

[61]    *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

WAS:184083.7

action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'"[62]

Both Petitioners sell capacity into the monthly NYISO ICAP spot capacity auctions that use the demand curves at issue to determine clearing prices. As such, both Petitioners are "objects" of FERC's actions in the orders on review. Petitioners were injured as a result of FERC's errors, the effects of which were to unlawfully reduce the capacity prices they have been paid since May, 2011 and will be paid through capacity year 2013/2014. A favorable judgment vacating the orders on review and remanding the case to FERC would redress those injuries. Thus, Petitioners meet the requirements of standing.

## ARGUMENT

"A reviewing court sets aside final action of FERC if that action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[63] FERC "'must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record.'"[64] The reviewing court also must "ensure that FERC 'articulate[s] a satisfactory explanation for its action including a rational

---

[62] *Id.* at 900 (quoting *Lujan*, 504 U.S. at 561-62).

[63] *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1319 (D.C. Cir. 2004) (citing 5 U.S.C. § 706(2)(A)) (other citation omitted).

[64] *Id.* (citation omitted).

31

connection between the facts found and the choice made.'"[65]  Typically, an agency

decision will be found arbitrary and capricious if the agency has "'entirely failed to

consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.'"[66]

Moreover, FERC has a duty, which it here failed to fulfill, to explain its

departure from prior relevant precedent and policy.  "[W]here an agency departs

from established precedent [or policy] without a reasoned explanation, its decision

will be vacated as arbitrary and capricious."[67]  When determining whether FERC

has provided a "reasoned explanation" for departing from precedent or policy, the

court "looks only to the reasons given by the agency."[68]  Furthermore, FERC is

obligated to follow the law and any orders found in violation of the law shall be set

aside.[69]  "To determine whether the agency's action is contrary to law, [the court]

---

[65] *Id.* (citation omitted).

[66] *AT&T Corp. v. FCC*, 236 F.3d 729, 734 (D.C. Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ("*State Farm*")).

[67] *ANR Pipeline Co. v. FERC*, 71 F.3d at 901 (citations omitted).

[68] *Id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)).

[69] 5 U.S.C. § 706(2) ("The reviewing court shall -- . . . hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (D) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

look[s] first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute."[70]  Agency attempts to issue orders beyond the authority granted by Congress are unlawful.[71]

As is more fully described below, FERC's orders under review are arbitrary and capricious, fail to provide reasoned decision-making, represent an abuse of discretion, or otherwise are contrary to law.  Accordingly, FERC's orders should be vacated and this matter remanded to FERC with directions to correct its orders consistent with the Court's ruling.

## A.    FERC's Suspension of the Proposed Rates in Excess of its Statutory Authority was Arbitrary and Capricious, and Contrary to Law

Section 205(e) of the FPA authorizes FERC to suspend the effective date of a proposed rate change for up to five months.[72]  FERC has no authority to extend a

---

[70]  *Maine Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 282 (D.C. Cir. 2006) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081-82 (D.C. Cir. 2001); *cf. Chevron USA, Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984)).

[71]  *See, e.g.*, *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002) (vacating FERC's decision requiring utilities to cede their Section 205 filing rights); *City of Idaho Falls, Idaho v. FERC*, 629 F.3d 222, 230 (D.C. Cir. 2011) (holding the court may not defer to agency interpretation that would violate the federal statute the agency administers) (citation omitted); *S. Cal. Edison Co. v. FERC*, 603 F.3d 996 (D.C. Cir. 2010) (vacating a Commission order where the Commission exceeded its statutory jurisdiction over electric transmission and encroached on state jurisdiction over retail sales).

[72]  16 U.S.C. § 824d(e).

33

suspension beyond this statutory maximum suspension period.[73]  That limitation on FERC's authority flows from the principle that a governmental agency's powers are limited to those provided by Congress.   Agency attempts to issue orders beyond the authority granted by Congress are unlawful.[74]

### 1.    The January 28 Order Established the Duration of the Suspension Period

In the January 28 Order, FERC accepted NYISO's November 30 Filing, and suspended the Proposed Rates "to become effective *the earlier* of June 28, 2011, or a date set by a subsequent Commission order in this proceeding"[75] and directed "the [Pre-existing Rates] will remain in effect until superseded."[76]  The January 28 Order went on to say that "due to the difficulties of implementing revised demand curves in mid-season, NYISO should indicate in its compliance filing the date it

---

[73]  *See Delmarva Power & Light Co.*, 48 F.P.C. 1157, 1158-59 (1972) (Moody, concurring) ("*Delmarva*") (noting that a certain provision of FERC's regulations could not be used to extend the suspension period to six months and stating that FERC "could not, lawfully, suspend for six months from the proposed effective date . . . because of the limitation on our power of suspension expressed in Sec. 205(e) of the Federal Power Act.").

[74]  *See supra* note 71.

[75]  January 28 Order at P 168 (emphasis added).

[76]  *Id.*

WAS:184083.7

anticipates implementing the new demand curves"[77] but "[s]uch a date should be no later than November 1, 2011."[78]

FERC has interpreted these two sentences in a manner to suggest they conflict with each other, and to suggest that the latter sentence trumps the former. In fact, the two sentences are not contradictory and do not mandate a result in conflict with FPA Section 205.

To understand why the two sentences are not contradictory, it is important to consider those sentences in the context of the three distinct rates discussed above: the Pre-existing Rates; the Proposed Rates; and the Compliance Rates.

The January 28 Order in fact complies with FPA Section 205. The Order directed that: (1) the Pre-existing Rates would remain in effect beyond their expiration of April 30, 2011 during the suspension period; (2) if the Compliance Rates were not implemented by June 28, 2011 (the end of the suspension period), the Proposed Rates would go into effect and supersede the Pre-existing Rates on that date, subject to adjustment once the Compliance Rates were implemented; and (3) the Compliance Rates would be implemented no later than November 1, 2011 and would be the rate going forward until the next reset. FERC itself subsequently issued an order on March 9, 2011 that supports this interpretation. It held that "the

---

[77]  *Id.*

[78]  *Id.*

35

current 2010/2011 demand curve [*i.e.*, the Pre-existing Rates] are to remain in effect without adjustment *during the suspension period*"[79] and "it was reasonable to suspend the Proposed Rates until the *earlier of* a date set by the Commission in an order accepting revised rates that comply with the January 28, 2011 Order, or five months."[80]

### 2. The Five-Month Suspension Authority Limitation is a Hard-and-Fast Rule

Suspending the Proposed Rates until the *earlier of* a date set by the Commission or five months was in compliance with FPA Section 205. FERC's statutory authority to suspend a proposed rate comes from FPA Section 205(e), which provides in relevant part:

> [T]he Commission . . . may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect. . . . If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period. . . .[81]

---

[79]  March 9 Order at P 16 (emphasis added).

[80]  *Id.* P 18 (emphasis in original).

[81]  16 U.S.C. § 824d(e).

36

On its face, this provision evidences a clear legislative command that limits FERC's authority to suspend a proposed rate for a maximum of five months.[82] Further, it is well settled that any attempt by FERC to suspend a proposed rate longer than five months would be beyond FERC's statutory authority and unlawful.[83]

Thus, the maximum FERC could suspend the Proposed Rates was five months. This seems to be indisputable. However, FERC subsequently ruled in its April 4 Order that the Pre-existing Rates were to remain in place beyond April 30, 2011 "until replaced by rates effective on a date set when the Commission acts on NYISO's filing to comply with the January 28, 2011 Order."[84] Noticeably, the April 4 Order omitted the operative words: "The earlier of" either "five months" or "June 28, 2011," thereby suspending the Proposed Rates beyond five months. Clearly FERC violated FPA Section 205 in issuing that ruling.

### 3.   Acceptance of the March 28 Compliance Filing Did Not Supersede the Proposed Rates

FERC's purported justification for suspending the Proposed Rates for longer than five months was that the Proposed Rates had been superseded and rendered

---

[82]   *City of Kaukauna v. FERC*, 581 F.2d 993, 995 & n.7 (1978).

[83]   *See, e.g.*, *Indiana & Michigan Elec. Co. v. FPC*, 502 F.2d 336, 343 (D.C. Cir. 1974); *Delmarva*, 48 F.P.C. at 1158-59 (Moody, concurring).

[84]   April 4 Order at P 10.

37

"moot" and "irrelevant" by FERC's acceptance of NYISO's March 28 Compliance Filing.[85]   Thus, FERC asserted that it did not exceed its statutory authority by extending the suspension period beyond the statutory maximum period because the Proposed Rates, its November 30 Filing, were "withdrawn" by the March 28 Compliance Filing.[86]

FERC's argument is fatally flawed.  It relies on a fiction of its own devise that the March 28 Compliance Filing was not a compliance filing directed by the January 28 Order and that NYISO made the filing of "its own volition only to prevent a potential gap in rates from occurring."[87] The record, however, tells another story.  The January 28 Order indisputably ordered NYISO to keep the Pre-existing Rates in effect beyond April 30, 2011 when they would have expired by operation of the then-effective tariff language.[88]   NYISO thus needed to submit tariff revisions to implement FERC's directive to enable the Pre-existing Rates to remain in effect, which it did in the March 28 Compliance Filing.

The fact that NYISO made its March 28 Compliance Filing to comply with the January 28 Order is indisputable as evidenced by the transmittal letter of the filing.  In the transmittal letter to the March 28 Compliance Filing, NYISO stated

---

[85]   May 19 Order at PP 104-105; December 15 Order at P 39.

[86]   December 15 Order at P 39.

[87]   *Id.*

[88]   January 28 Order at P 168.

38

that the filing is "*[i]n compliance with* the Commission's *January 28, 2011 Order*
on the NYISO's filing proposing updated [ICAP] Demand Curves . . . and the
Commission's *March 9, 2011 order* on the NYISO's request for clarification . . . ,
[and] the NYISO *submits this compliance filing*."[89] Furthermore, the April 4 Order
explicitly recognized that NYISO submitted the March 28 Compliance Filing "*to
comply* with the *January 28, 2011 Order* in this proceeding to establish that the
currently effective [ICAP] Demand Curves will remain in effect on and after May
1, 2011."[90] Thus, both NYISO and FERC characterized the March 28 Compliance
Filing as a filing to comply with the directives of the January 28 Order and not a
stand-alone rate filing as the December 15 Order suggests. Further, nothing in
NYISO's March 28 or 29 Compliance Filings suggests that NYISO was
withdrawing the Proposed Rates as FERC later claimed in its December 15 Order.
Rather, NYISO continued to support its Proposed Rates, as evidenced by the fact
that it filed a request for rehearing seeking to have FERC reverse the rulings FERC
had made rejecting aspects of the Proposed Rates. It would have made no sense
for NYISO to file for rehearing if it were withdrawing the Proposed Rates.

---

[89]   NYISO March 28, 2011 Transmittal Letter at 1 (emphasis added).
[90]   April 4 Order at P 1 (emphasis added).

WAS:184083.7

### 4. Any Deemed Withdrawal Did Not Comply with Section 35.17 of FERC's Regulations

Moreover, any purported withdrawal of the Proposed Rates did not comply with Section 35.17 of FERC's regulations. FERC's regulations provide in relevant part that a suspended rate "may be withdrawn during the period of suspension *only by special permission* of the Commission granted *upon application* therefor and for good cause shown."[91]

In this case, the record is absent of any request by NYISO to withdraw the Proposed Rates and, likewise, FERC has not granted NYISO special permission to do so.

### B. FERC Erred in Imposing a Maximum Suspension Period

FERC also erred in suspending the Proposed Rates, for the maximum period, rather than one day, and its failure to respond to arguments concerning its error in the application of its suspension policy was arbitrary and capricious. FERC's ruling represents an unexplained departure from FERC's precedent and policy.

FPA Section 205(e) requires that FERC give a reasoned explanation for its decision to suspend a proposed rate.[92] In reviewing suspension decisions, courts

---

[91]  18 C.F.R. § 35.17(c) (emphasis added).

[92]  16 U.S.C. § 824d(e) ("the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate. . . .").

40

look to whether the reasons FERC gives are "in some way [] related to FERC's interim or ultimate inquiries."[93]   Even if this test is satisfied, "remand . . . for further articulation of reasons" is appropriate if either: (i) FERC "impos[es] two different suspension lengths in cases that are absolutely indistinguishable, and . . . fail[s] to offer even summary reasons to explain the difference;" or (ii) FERC's action "was plainly and absolutely foreclosed by existing rules or past precedent."[94]   In particular, FERC has a duty, which it here failed to fulfill, to explain its departure from prior relevant precedent and policy.[95]   Additionally, an agency decision will be found arbitrary and capricious if the agency has "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"[96]

---

[93]   *Exxon Pipeline Co. v. United States*, 725 F.2d 1467, 1473 (D.C. Cir. 1984).

[94]   *Id.* at 1474.

[95]   *ANR Pipeline Co.*, 71 F.3d at 901.

[96]   *AT&T Corp.*, 236 F.3d at 734.

1.    **FERC Failed to Offer a Reasoned-Explanation for its Departure from Prior Relevant Precedent and Policy**

To support its decision to suspend the proposed NYC demand curve rate for the maximum period, FERC principally relied on two cases, *Boston Edison Co.*[97] and *Great Lakes Transmission Co.*[98]   However, these cases are readily distinguishable from the case at hand and do not represent current Commission suspension policy.

In *Boston Edison* and *Great Lakes*, FERC found that proposed rate increases might be overstated and, accordingly, may be unjust and unreasonable.   The implication of those orders was that the rates FERC ultimately would approve might be lower than the proposed rates.[99]

The rationale to suspend the rates for the maximum period in *Boston Edison* and *Great Lakes* does not apply in this case.   Unlike *Boston Edison* and *Great Lakes*, FERC's ruling on individual issues leads to only one conclusion, *i.e.*, that NYISO *understated* the Proposed Rate and that *the just and reasonable rates would be substantially higher than NYISO proposed*.   Again, all of FERC's twelve specific rulings in the January 28 Order either had no effect on NYISO's proposed

---

[97]   12 FERC ¶ 61,211 (1980) ("*Boston Edison*").

[98]   12 FERC ¶ 61,293 (1980) ("*Great Lakes*").

[99]   *See Boston Edison*, 12 FERC at 61,515-16; *Great Lakes*, 12 FERC at 61,673-74.

42

demand curve or moved the curve upward, which would produce a higher rate.[100] Because the Proposed Rates were higher than the Pre-existing Rates, suspending the Proposed Rates for the maximum period left the lower Pre-existing Rates in effect, thereby harming suppliers by forcing them to charge a rate below the Proposed Rates, which in themselves were lower than the just and reasonable rates, while at the same time not curing any harm to ratepayers. Thus, the rationale under *Boston Edison* and *Great Lakes* for ordering a maximum suspension period does not apply to this case.

Furthermore, FERC's suspension policy under *Boston Edison* and *Great Lakes* has evolved significantly since the time of those issuances. Under *Boston Edison* and *Great Lakes*, it was FERC's policy that rate filings generally should be suspended for the maximum period permitted by statute where a preliminary study indicates the filing may be unjust and unreasonable absent circumstances indicating that suspension for the maximum period might lead to harsh and inequitable results.[101] FERC's stated purpose for generally imposing a maximum

---

[100] *See supra* pp. 17-18 and note 31.

[101] *See supra* note 99.

43

suspension on rate filings that may be unjust and unreasonable is "to protect the consumer . . . against excessive rates and charges."[102]

FERC, however, modified that suspension policy shortly after *Boston Edison* and *Great Lakes*.  Two years after issuing those decisions, FERC issued its revised suspension policy in *West Texas*, which requires that with certain exceptions, neither of which is present here, rates would be suspended for one day instead of five months, a policy that to this day remains.  FERC held:

> Under our restated electric rate suspension policy, a utility's increased rates *will be suspended* for *only one day instead of the five month maximum* in those cases where our preliminary analysis indicates that no more than ten percent of the increase appears to be excessive.[103]

FERC justified its *West Texas* policy by stating that its revised suspension policy fulfilled the purpose behind the suspension powers it was granted by Congress; "to strike a fair balance between the needs of the public and the needs of the utilities" [or in this case suppliers] that will not "deprive [utilities] forever of

---

[102] *Id.*  It should be noted, however, that a higher rate is not necessarily excessive.  To be excessive, the rate must be above the zone of reasonableness.  *See Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984); *see also Interstate Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 31 (D.C. Cir. 2002).

[103] *West Texas*, 18 FERC at 61,375 (emphasis added).

substantially cost-justified revenues that would have been collected in the absence of a maximum five month suspension period."[104]

But here FERC reverted back to its suspension policy from *Boston Edison* and *Great Lakes*, stating "[t]he Commission's policy regarding rate suspensions is that rate filings generally should be suspended for the maximum period permitted by statute where preliminary study leads the Commission to believe that the filing may be unjust, unreasonable, or that it may be inconsistent with other statutory standards."[105]

Moreover, FERC did not properly apply the exceptions to its *West Texas* suspension policy. *West Texas* provides two exceptions to the one-day suspension policy, neither of which is present here. First, *West Texas* provides for a five-month suspension when FERC's preliminary analysis indicates that more than ten percent of the increase may be excessive. Here, the Proposed Rates were not excessive. To the contrary, the FERC's decisions in the January 28, 2011 Order showed that the Proposed Rates should have been higher.

Second, FERC has an exception that would permit it to suspend a rate increase for the maximum five-month suspension even though the increase does

---

[104]  *Id.*

[105]  January 28 Order at P 168 (citing *Boston Edison*, 12 FERC ¶ 61,211; *Great Lakes*, 12 FERC ¶ 61,293).

45

not appear to be "substantially excessive." The exception occurs if "extraordinary factors indicate that wholesale customers *may suffer irreparable harm absent a five month suspension. . . .*"[106]

In upholding its five-month suspension decision, FERC tried to rely on this second exception saying "extraordinary circumstances exist in this case [to justify a maximum suspension] because of the unique nature and purpose of the rates filed, in contrast to the typical rates at issue in cases where we have applied *West Texas.*"[107]

However, FERC's reliance on the existence of "extraordinary circumstances" to justify a maximum suspension for an understated rate is misplaced. Allowing the Proposed Rates to go into effect in no way would have harmed wholesale customers. By paying the Proposed Rates, they would have paid a rate higher that the Pre-existing Rates but lower than the just and reasonable rate derived from FERC's January 28 Order. Thus, imposition of the maximum suspension period here was inconsistent not just with *West Texas*, but also with *Boston Edison* and *Great Lakes*. Further, FERC offered no explanation of what the

---

[106] *West Texas*, 18 FERC at 61,375 (citing *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 653 (1978)) (emphasis added). FERC further stated that extraordinary circumstances also may dictate a shorter suspension regardless of the amount of increase. *Id.*

[107] March 9 Order at P 17 n.13 (internal citation omitted).

46

"extraordinary circumstances" were that it relied upon, thereby providing no basis

to understand what perceived circumstances supported its decision.

Moreover, if FERC desired to revert to its suspension of *Boston Edison* and

*Great Lakes*, and in the process misapply *West Texas*, it had to do so in a manner

that was not arbitrary and capricious by indicating that its prior policy was being

deliberately changed and by offering a reasoned explanation for its departure. "An

agency changing its course must supply a reasoned analysis indicating that prior

policies and standards are being deliberately changed, not casually ignored, and if

an agency glosses over or swerves from prior precedents without discussion it may

cross the line from the tolerably terse to the intolerably mute."[108]  FERC's failure

to provide a reasoned explanation for its departure from *West Texas* is an

additional reason to vacate its order.  Vacating FERC's order is particularly

appropriate here where it is clear that FERC created, rather than mitigated, a harm

by its decision to force suppliers to sell capacity at prices that FERC itself

effectively suppressed below just and reasonable levels.

---

[108] *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970); *see also ANR Pipeline Co.*, 71 F.3d at 901 ("Indeed, where an agency departs from established precedent [or policy] without a reasoned explanation, its decision will be vacated as arbitrary and capricious.").

47

2.     **FERC's Order was Arbitrary and Capricious Because It Failed to Consider and Address Arguments of Critical Importance to the Suspension Decision**

An important argument TC Ravenswood made concerning the suspension period related to NYISO's unique role, as an ISO, in proposing wholesale rates on behalf of sellers in its markets. TC Ravenswood urged FERC to take into account NYISO's role as distinguished from the traditional, public utility that files rate adjustments on its own initiative.[109] However, FERC failed to even acknowledge, much less consider, this argument and how it should weigh this important and unique aspect in its suspension decision.[110]

NYISO is not a traditional public utility that files rate increases to increase its own revenues. Rather, the Proposed Rates are rates that public utility sellers, such as Petitioners, would be authorized to be paid in order to compensate them for providing capacity service. The interests of capacity sellers do not necessarily align with the interests of the filing entity, an ISO in this case. FERC has previously stated that capacity suppliers are entitled to a rate for capacity updated

---

[109] *See* TC Ravenswood February 7, 2011 Request for Rehearing at 8; Independent Power Producers of New York, Inc. ("IPPNY") February 14, 2011 Request for Limited Expedited Rehearing at 8.

[110] *AT&T Corp.*, 236 F.3d at 734 (finding that an agency's actions would be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise") (internal quotation omitted).

every three years.  Here, FERC did not take care to protect the interests of capacity sellers.

There is no evidence that FERC considered this circumstance in rendering its decision concerning the length of the suspension period.  In fact, consideration of the financial impact of the suspension decision suggests FERC disregarded the fact that the filing entity here was not the filing entity under the statutory scheme envisioned by the FPA.

By ignoring TC Ravenswood's argument, FERC failed to satisfy its "fundamental obligation to engage in reasoned decision making,"[111] which necessarily "renders its decision . . . arbitrary and capricious."[112]

## C.    FERC's Removal and Substitution of the Escalation Factor from the Pre-existing Rates Violated its Policy against Piecemeal Ratemaking

In addition to erring by requiring the Pre-existing Rates to remain in effect after June 28, 2011, FERC's order sought to suspend the laws of economics and discount the impact of inflation on the costs of building a power plant by requiring the Pre-existing Rates to remain in effect after April 30, 2011, without escalation. FERC's continuation of the rates with an escalation factor of 0% violates both fundamental economics as well as FERC's policy against piecemeal ratemaking.

———————————

[111] *Moraine Pipeline Co. v. FERC*, 906 F.2d 5, 8 (D.C. Cir. 1990) ("*Moraine*").

[112] *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("*CAPP*").

49

The Pre-existing Rates were derived from the 2008/2009 ICAP demand curve rates, which included an annual escalation factor of 7.8%.[113]  Again, the Pre-existing Rates expired by the terms of the NYISO's tariff on April 30, 2011.  In response to FERC's order that the Pre-existing Rates should remain in effect during the suspension period past April 30, 2011, NYISO requested that FERC escalate the rates by a factor of 1.7%, the escalation factor of the Proposed Rates.[114]  In opposition to that request, TC Ravenswood argued the rates should be escalated after May 1, 2011 by 7.8%, the annual escalation factor that was an integral component of the 2008/2009 rate.[115]  FERC rejected both requests on grounds that "Commission precedent does not provide for piecemeal review of a single component of a filed rate."[116]  Yet, FERC inexplicably engaged in the same improper piecemeal ratemaking by extracting the 7.8% escalation factor from the integrated Pre-existing Rates and replacing it with a 0% escalation factor.[117]

FERC policy against piecemeal ratemaking is well established.  In Order No. 679, FERC stated that it does "not generally permit 'single issue' rate filings

---

[113]  *See* 2008 Reset Order, 122 FERC ¶ 61,064 at PP 54-55 (accepting NYISO's proposed annual escalation rate of 7.8% for the 2009/2010 and 2010/2011 ICAP Demand Curves as part of NYISO's revised tariff).

[114]  NYISO February 10, 2011 Request for Clarification at 3.

[115]  TC Ravenswood February 15, 2011 Answer at 2-3.

[116]  March 9 Order at P 16.

[117]  *Id.*

WAS:184083.7

(selective rate adjustments)," but rather "require[s] a utility seeking a rate increase to expose all of its costs to review. . . ."[118]  FERC reiterated its policy in Order No. 890:

> Allowing single-issue rate adjustments would enable a utility to increase the total rate charged by focusing solely on a single cost element, while avoiding scrutiny of all other determinants of the rate.  FERC has an obligation to ensure the *justness and reasonableness of the total rate* and it would be improper to allow a utility to raise rates by selectively focusing only on particular elements of its costs, while avoiding scrutiny of other rate inputs.  FERC has refused to allow such rate treatment except in the most limited of circumstances . . . .[119]

FERC policy against piecemeal ratemaking applies to rate filings by NYISO.  FERC has ruled that "any change in the formula requires a section 205 rate filing, whereupon FERC must review anew the rate as a whole."[120]  Recently, FERC stated that "[i]n setting a just and reasonable rate, FERC does not look at a single component but rather, looks at *all components* . . . [because] Commission precedent as well as equity considerations requires that we consider all changes

---

[118]  Order No. 679 at P 23.

[119]  Order No. 890 at P 767.

[120]  *Ocean State Power II*, 69 FERC ¶ 61,146, at 61,552 (1994).

that would affect the current rate. . . ."[121]  FERC reaffirmed that very policy against piecemeal ratemaking by rejecting NYISO's request to include a 1.7% escalation factor in the Pre-existing Rates.[122]

However, approval of the Pre-existing Rates with a 0% escalation factor *also* violates FERC policy against piecemeal ratemaking.  ICAP demand curve rates are based upon an integrated set of rate variables and assumptions established for an initial year that are escalated thereafter by the escalation factor to establish the demand curve rates for subsequent years.[123]  The integrated set of variables and assumptions and the escalation factor *together* constitute a single integrated rate.[124] In fact, FERC itself in another proceeding just recently confirmed that the escalation factor it adopts in determining Net CONE must be applied from year-to-year, ruling:

> [B]ecause the intent is to compare the Unit net CONE amount stated in one year's dollars to demand curve prices stated in dollars of three to six years in the future,

---

[121]  *IPPNY*, 125 FERC ¶ 61,311 at P 33 (emphasis added); *see also Houlton Water Co.*, 55 FERC at 61,110 ("[T]he Commission in setting an overall just and reasonable rate does not look to a single component of the overall rate, but rather looks to all the components. . . ."); *Iroquois Gas Transmission Sys., L.P.*, 80 FERC at 61,845 (confirming FERC policy against adjusting rates on a piecemeal basis).

[122]  *See supra* note 116.

[123]  *See* NYISO November 30, 2010 Transmittal Letter at 3-4.

[124]  *See* TC Ravenswood February 14, 2011 Answer at 7; TC Ravenswood April 8, 2011 Request for Clarification and Rehearing at 10.

WAS:184083.7

it is necessary to restate, *i.e.*, inflate the Unit net CONE value in order to render a valid comparison in constant "real" dollar terms. Therefore, we find that an inflation factor should be applied to Unit net CONE. . . .[125]

Consistent with our finding above, we find that Unit net CONE and projected demand curve prices . . . should be inflated by the same inflation rate that is included in the latest effective demand curve escalation factor.[126]

Without an inflation adjustment, a static offer floor would understate Unit net CONE over time.[127]

Accordingly, the Pre-existing Rates *inclusive of the 7.8% escalation factor* are protected from piecemeal review of their constituent components by FERC policy against piecemeal ratemaking. FERC denied NYISO's request to include a 1.7% escalation factor in the Pre-existing Rates based on the rationale that including an escalation factor *other than 7.8%* violates FERC policy against piecemeal ratemaking.[128] The failure of FERC to recognize that extending the Pre-existing Rates beyond their expiration date with a 0% escalation rate is subject to the same policy limitation upon which it denied NYISO's request constitutes unreasoned decision-making. Accordingly, because FERC extended the Pre-existing Rates beyond the date it expired on April 30, 2011, FERC was required to

---

[125] *Astoria Generating Company L.P.*, 139 FERC ¶ 61,244, at P 60 (2012).

[126] *Id.* P 62.

[127] *Id.* P 73.

[128] *See* March 9 Order at P 16.

WAS:184083.7

escalate it at the 7.8% escalation rate that was an embedded component of that rate, effective May 1, 2011 until June 28, 2011. On that date, the Pre-existing Rates should have been replaced by the Proposed Rates.

## D.    FERC Erred in Approving an Escalation Factor Based on General Measures of Consumer Price Inflation Rather than HW Index

As discussed above, FERC's process for setting ICAP rates for a three-year period involves determining the appropriate demand curve with the attendant rate for an initial year and escalating that rate in years two and three by a set escalation factor. The escalation factor is adopted as a component in the order approving the first-year rate—in this case for the 2011/2012 capability year. Thus, application of the escalation factor to the 2011/2012 demand curve produces the 2012/2013 and 2013/2014 demand curves, the determination of which is the central purpose of the underlying proceeding. FERC policy and precedent, as well as substantial record evidence, establish that the HW Index is the proper measure to derive the escalation factor. It incorporates technology- and location-specific cost differences of gas turbine peakers in the North Atlantic region (*i.e.*, the region which encompasses the NYISO markets), the proxy unit used to derive the costs and revenues which form the shape of the demand curve. FERC erred by adopting a general measure of consumer price inflation that bears no relationship to the cost increases for that proxy unit that is used to determine Net CONE.

54

1.     **FERC Refused to Provide Any Substantive Explanation for Departing from its Policy to Use the Industry-Specific HW Index to Derive the Escalation Factor**

FERC's acceptance of an annual escalation factor derived from general measures of consumer price inflation, rather than from the industry-specific HW Index, constitutes an unexplained departure from FERC precedent.[129] The last time ICAP rates were reset, FERC accepted an escalation factor derived from the HW Index because it "accounts for all elements of engineering, procurement, and construction costs . . . [and] is specifically tailored to the [utility] industry, is widely used by the industry and thus is an appropriate data source . . . ."[130] FERC specifically rejected proposals to adopt an escalation factor derived from general measures of inflation because FERC "does not agree that a general inflation factor, on its own, sufficiently accounts for expected changes in power plant construction costs, and finds that it is reasonable to rely on the Handy-Whitman Index as it is an Index specifically tailored to the utility industry."[131] For similar reasons, FERC used the HW Index to derive escalation factors for setting ICAP rates in other

---

[129]  *See State Farm*, 463 U.S. at 43; *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 322 (D.C. Cir. 2006) ("*Williams*").

[130]  2008 Reset Rehearing Order, 125 FERC ¶ 61,299 at PP 35; *see also* 2008 Reset Order, 122 FERC ¶ 61,064 at PP 47, 54.

[131]  2008 Reset Order, 122 FERC ¶ 61,064 at P 54.

55

organized markets.[132]  FERC noted that the HW Index "supplies a known and unbiased adjustment factor" that provides market participants with "a higher degree of certainty regarding forecasted CONE values," facilitates "capacity market stability," fosters "locational construction of new resources," and promotes "conditions conducive to long-term contracts for capacity resources."[133]

In this case, FERC failed to provide any substantive explanation for departing from its policy of accepting the industry-specific HW Index.[134]  As the Supreme Court stated, "an agency changing its course . . . is obligated to supply a *reasoned analysis* for the change . . . ."[135]  FERC attempted to justify its policy change on grounds that:  (i) FERC determinations in the PJM Interconnection, L.L.C. ("PJM")and ISO New England Inc. ("ISO-NE") markets are not binding in NYISO markets; (ii) FERC does not require NYISO, PJM, and ISO-NE to adopt "identical" market structures; and (iii) NYISO, PJM, and ISO-NE use demand

---

[132]  *See PJM Interconnection, L.L.C.*, 129 FERC ¶ 61,090, at P 38 (2009) ("*PJM*"), *order on reh'g*, 131 FERC ¶ 61,168, at P 18 (2010); *ISO New England Inc.*, 131 FERC ¶ 61,065, at PP 141, 150, *order on reh'g*, 132 FERC ¶ 61,122 (2010).

[133]  *PJM*, 129 FERC ¶ 61,090 at P 38.

[134]  *See* January 28 Order at P 150; May 19 Order at P 89.

[135]  *State Farm*, 463 U.S. at 57 (emphasis added).  This Court has on many occasions affirmed the principle that an agency must satisfactory explain its departure from established policies.  *See, e.g., Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) ("*American Gas*"); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 315 F.3d 316, 323 (D.C. Cir. 2003); *Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117, 122 (D.C. Cir. 1989).

56

curves based on different assumptions.[136]    FERC's conclusory statements, however, fail to explain how the *general measures of inflation* approved by FERC in this proceeding more accurately forecast gas turbine peaker cost increases than the *technology- and location-specific measure of inflation* approved by FERC in the prior NYISO reset proceeding.    Importantly, FERC did not find that (i) the policy to derive escalation factors from the industry-specific HW Index is flawed, (ii) the factual determinations underlying the policy are incorrect, or (iii) the HW Index did not accurately estimate the actual rate of cost increases of gas turbine peakers in the prior NYISO reset proceeding.[137]    In fact, FERC specifically refused to conclude that the HW Index "used by NYISO . . . and other RTOs as a basis for developing inflation estimates is an inappropriate basis for developing such forecasts."[138]    Ultimately, FERC "neither explained its action as consistent with precedent nor justified it as a reasoned and permissible shift in policy."[139]

---

[136]  May 19 Order at P 89.

[137]  *See generally* January 28 Order at P 150; May 19 Order at PP 82-89.

[138]  January 28 Order at P 150.

[139]  *Williams*, 475 F.3d at 322; *see also Natural Gas Supply Ass'n*, 137 FERC ¶ 61,051, at P 26 n.20 (2011); *Wisconsin Valley Improvement Co. v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001).

WAS:184083.7

## 2.     FERC Ignored Substantial Evidence that Establishes that General Measures of Inflation Do Not Accurately Forecast the Cost Increases of Gas Peakers

FERC also ignored substantial evidence that establishes the consumer inflation forecasts NYISO used to derive the escalation factor *bear no relation* to the rate of cost increases of constructing gas turbine peakers, the proxy units in New York.  No record evidence demonstrates that general forecasts of consumer inflation accurately measure cost increases of gas turbine peakers; rather, the record evidence demonstrates that the cost increases of gas turbine peakers will escalate well in excess of the general inflation rate.[140]  Further, FERC offered no explanation on how the three general measures of inflation NYISO used to derive the escalation factor are relevant to the rate of inflation applicable to the costs of a gas turbine peaker.[141]  That failure is particularly poignant given that two of the three consumer inflation forecasts NYISO used specifically exclude energy prices, thereby de-linking the forecasts from the specific exercise in the underlying proceeding—measuring a rate of inflation that is directly related to energy prices. Thus, unable to explain how general consumer inflation forecasts, *which exclude energy prices*, could possibly measure gas turbine peaker costs in New York, FERC simply stated that it reviewed all evidence, listed several assertions of

---

[140]   *See* Levitan Aff. at PP 130-137.

[141]   *See* January 28 Order at P 150; May 19 Order at PP 82-89.

58

NYISO witnesses, and concluded that it was persuaded by these assertions.[142] In so doing, FERC abdicated its "fundamental obligation to engage in reasoned decision making."[143]

Although a reviewing court defers to an agency's discretion "[i]f the evidence is susceptible to more than one rational interpretation," an agency cannot "offer[] an explanation for its decision that runs counter to the evidence. . . ."[144] In failing to consider substantial evidence, FERC based its decision on unsupported assertions.[145] For instance, FERC noted it will accept an escalation rate that (i) is based on substantial evidence, which is a "judgment" informed by cost and inflation trends, and (ii) falls within the zone of reasonableness.[146] However, instead of considering substantial evidence that gas turbine peaker costs will escalate in excess of the general inflation rate,[147] FERC incorrectly asserted that use of a general inflation rate to derive the escalation factor is reasonable because the general inflation rate represents "going forward" costs whereas the HW Index

---

[142] *See* May 19 Order at PP 83-84.

[143] *Moraine*, 906 F.3d at 8.

[144] *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1212 (9th Cir. 2008).

[145] *See* January 28 Order at P 150; May 19 Order at PP 85-87.

[146] May 19 Order at P 85.

[147] *See* Levitan Aff. at PP 130-137.

59

represents "historical" costs.[148]    However, no evidence suggests that use of historical data in the HW Index undermines its ability to project accurately future costs.  Further, FERC concluded that the 1.7% escalation rate falls within the zone of reasonableness because "the Commission has reasonably relied upon . . . [NYISO's] evidence to support its finding."[149]    FERC's reliance on NYISO's unsupported "judgment" calls[150] constitutes the same type of "rubber stamp[ing] of NYISO's findings" that FERC warned against in the first reset proceeding.[151] FERC's failure to address substantively how general measures of inflation accurately forecast the cost increases of gas turbine peakers constitutes unreasoned decision-making and is therefore arbitrary and capricious.[152]

### E.    FERC's Acceptance of Flawed Historic Data Period and Inadequate Statistical Diagnostic Tests to Derive the Projected E&AS Revenues was Arbitrary and Capricious

FERC also erred by relying on a flawed historic data period and inadequate statistical tests, which produced inaccurate E&AS Revenues for use in determining

---

[148]    *See* May 19 Order at PP 82, 85, 88.

[149]    *Id.* P 86.

[150]    *See* January 28 Order at P 150; May 19 Order at P 85.

[151]    *See New York Indep. Sys. Operator, Inc.*, 111 FERC ¶ 61,117, at P 85 (2005) ("The Commission must rely on evidence in the record to approve the applicant's proposals and may not merely rubber stamp NYISO's findings.").

[152]    *See CAPP*, 254 F.3d at 299; *Moraine*, 906 F.2d at 8.

60

Net CONE. By doing so, FERC violated its "fundamental obligation to engage in reasoned decision making."[153]

A reviewing court must determine "whether FERC has *examined the relevant data* and *articulated a satisfactory explanation for its action*, including a rational connection between the facts found and the choice made."[154] FERC's broad discretion to exercise its regulatory jurisdiction[155] does not absolve it from its duty to "fully articulate the basis for its decision. . . ."[156] FERC's refusal to consider the flaws (or solutions thereto) that produce inaccurate E&AS Revenues constitutes unreasoned decision-making and is therefore arbitrary and capricious.

FERC accepted inaccurate E&AS Revenues based on flawed statistical data and a flawed analysis. NYISO's consultant, NERA, derived the E&AS Revenues by simulating NYISO dispatch models that require estimates of energy prices. NERA obtained these energy prices from the Regression Model.[157] The Regression Model contains two fundamental flaws. First, NERA used a historical period to estimate the Regression Model's parameters which is too short to predict

---

[153] *Moraine*, 906 F.3d at 8.

[154] *Electricity Consumers*, 407 F.3d at 1236 (internal quotation marks omitted).

[155] *American Gas*, 593 F.3d at 19.

[156] *Missouri Pub. Serv. Comm'n v. FERC*, 601 F.3d 581, 586 (D.C. Cir. 2008) (internal quotation marks omitted).

[157] *See* May 19 Order at P 69; *see also* NYISO November 30, 2010 Transmittal Letter at 19.

61

E&AS Revenues accurately (*i.e.*, 3 years).[158]  Second, NERA failed to use basic statistical tests to ensure the accuracy of the Regression Model's projections.[159] These flaws caused NERA to overstate the projected E&AS Revenues, which ultimately reduces Net CONE and unreasonably reduces rates.[160]  To correct these flaws, NYC Suppliers' witness Carlson recommended that NERA (1) use a longer historical period for estimating the Regression Model's parameters (*i.e.*, 6 years),[161] and (2) modify the Regression Model to pass basic statistical tests required by standard econometric practices.[162]

Importantly, in the underlying proceeding, NYISO and the NYC Suppliers agreed on some of the *substantive* and *fundamental* aspects of these data and testing flaws in the Regression Model.  Regarding the historical data period, NYISO's witness Falk agreed with Carlson that "a certain minimum length of data is needed for accurate estimation" of model parameters.[163]  Regarding the

---

[158]  Carlson Aff. at P 7.

[159]  *Id.*

[160]  *See* NYC Suppliers Answer at 15 (discussing Carlson Affidavit).

[161]  Carlson Aff. at P 9; *see* NYC Suppliers Protest at 57; *see also* Carlson Aff. at PP 92-145 (discussing in detail the insufficiency of the historic period used by NERA and ultimately adopted by FERC).

[162]  Carlson Aff. at P 9; *see* NYC Suppliers Protest at 57; *see also* Carlson Aff. at PP 147-191 (discussing in detail the inadequate diagnostic testing performed by NERA and ultimately approved by FERC).

[163]  Carlson Supplemental Aff. at P 4 (discussing Falk Affidavit).

62

statistical testing issue, Carlson agreed with Falk that "[t]he NERA model methodology is to look at the magnitude of estimated . . . effects and to look at the residuals from the regressions to fit the model."[164]   Further, in Falk's answering affidavit, Falk admitted that he did not dispute, and even *agreed with*, a number of Carlson's arguments and observations regarding the problems with both *the data* and *the pricing model* used by NERA.[165]

Given the agreement between NYISO and the NYC Suppliers on *substantive aspects* of the two flaws, FERC tepidly approved the inaccurate E&AS Revenues.[166]   Rather than explaining how flawed data and inadequate diagnostic testing produce accurate E&AS Revenues, FERC simply concluded: "[w]e are not persuaded . . . that . . . [NERA's] approach to developing pricing models is *so seriously flawed* that it cannot be relied on for estimating energy and ancillary services revenues."[167]   On rehearing, FERC provided no clarification regarding the degree to which record evidence can be seriously flawed before becoming unjust and unreasonable.[168]   Rather, FERC acknowledged the agreement between NYISO

---

[164]   Falk Aff. at P 23; Carlson Supplemental Aff. at P 13.

[165]   *See* Carlson Supplemental Aff. at PP 7-15 (discussing points of agreement between NYISO's witness Mr. Falk and NYC Suppliers' witness Dr. Carlson).

[166]   *See* January 28 Order at P 136; May 19 Order at PP 73-75.

[167]   January 28 Order at P 136 (emphasis added).

[168]   May 19 Order at PP 73-75.

63

and the NYC Suppliers on the *substantive aspects* of the two flaws, stating that "*all*

*parties agree* that different statistical approaches will yield different outcomes. . .

."[169]  Furthermore, FERC "*agree[d] with the New York City Suppliers* that greater

variation in the dependent variable that may come from using a longer historical

period [(*i.e.*, the historical data period issue)] and greater attention to approaches

for addressing problems with heteroscedasticity [(*i.e.*, the diagnostic testing issue)]

may yield more robust econometric estimations."[170]  FERC nevertheless approved

the flawed E&AS Revenues.[171]  FERC's acceptance of the flawed Regression

Model violates FERC's obligation to engage in reasoned decision-making.[172]

## F.  FERC Engaged in Arbitrary and Capricious Decision-making by Eliminating Property Taxes in Calculating the Cost of New Entry During the Demand Curve Reset

FERC made two errors in excluding property taxes from the demand curve

reset.  First, it failed to follow the precedent in *IPPNY* and engaged in piecemeal

ratemaking by looking at only one component of the generator's cost (a change in

property tax laws) after its approval of the demand curve.  Second, even assuming

that it was appropriate to look at one cost component, FERC lacked an adequate

---

[169]  *Id.* P 75.

[170]  *Id.* (emphasis added).

[171]  *Id.*

[172]  *Moraine*, 906 F.2d at 8; *see* NYC Suppliers' Rehearing Request at 19 n.88.

WAS:184083.7

record in looking at that issue and thus its decision contained "general and conclusory" statements lacking record support.[173]

### 1.  FERC Engaged in Arbitrary and Capricious Decision-making by Failing to Follow its Precedent from the *IPPNY Complaint Order*

The circumstances between (i) the 2008 demand curve reset and the *IPPNY Complaint Order*, and (ii) the case on appeal are indistinguishable.  As such, FERC should have followed its precedent from the *IPPNY Complaint Order*.  But FERC did not – it approved the 2011 demand curve reset and then revised only the property tax component based on a change in circumstances – and its explanation for failing to follow the *IPPNY Complaint Order* is inadequate.  Therefore the FERC engaged in arbitrary and capricious decision-making.[174]

#### a.  Because the circumstances in the *IPPNY Complaint Order* are indistinguishable from the case on appeal, FERC engaged in arbitrary and capricious decision-making by failing to follow the *IPPNY Complaint Order* precedent

The circumstances in the *IPPNY Complaint Order* and in this appeal are indistinguishable.  But in the *IPPNY Complaint Order*, FERC refused to engaged in piecemeal ratemaking, *i.e.*, it refused to revise just one cost component of the demand curve reset after approving the 2008 demand curve reset.  In the present case, however, FERC engaged in piecemeal ratemaking.  FERC revised the one

---

[173]  *Algonquin*, 984 F.2d at 1312.

[174]  *Williams*, 475 F.3d at 328-30 (vacating orders because FERC neither explained how its action was consistent with precedent nor justified it as a reasoned and permissible shift in policy).

65

cost component – property taxes – based on a change in the property tax laws in New York after approval of the 2011 demand curve reset.

### i.    IPPNY

Power plants, like any other property in NYC, are subject to property taxes. As such, if property taxes are imposed, they must be included in the cost of the generating facility used during the demand curve reset or as FERC said in the case on appeal, "[p]roperty taxes are legitimate costs that are normally included [in] the cost of new entry."[175]

At the time of the 2008 three-year review, however, generating units in NYC were exempt from property taxes as a matter of right.  Therefore, when FERC approved the 2008 demand curve reset, property taxes were not included in that reset, a point that no one, including Petitioners, contested.

But then in June 2008, six months after FERC's January 29, 2008 approval of the 2008 demand curve reset, the New York legislature eliminated the exemption and new generating facilities in NYC were required to pay property taxes.  As FERC said, "[e]ffective June 30, 2008, the New York legislature eliminated the tax exemption [the exemption in effect at the time of the 2008 demand curve reset]" increasing the cost to build in NYC.[176]

---

[175]   January 28 Order at P 88.

[176]   *IPPNY*, 125 FERC ¶ 61,311 at P 5.

66

While there was no dispute that property taxes would now be paid (which would impact the costs for generators to enter the NYC market), there was considerable dispute over whether to amend the 2008 demand curve reset to account for newly required property tax payments. When IPPNY and others asked FERC in October 2008 to include property taxes in the 2008 reset process, the New York Public Service Commission ("NYPSC") and NYC among others opposed that request because IPPNY, *et al.*, "failed to provide sufficient justification for circumventing NYISO's three year reset process [the 2008 demand curve reset process] in order to address a single factor [property taxes] affecting the Demand Curves that may adversely affect the economic interests of one party or market sector."[177]   Transmission Owners [entities that would pay the increased rates if property taxes were included] stressed the importance of looking at these issues in a comprehensive fashion – based on the record at the time of the three year demand curve reset – adding the "three year reset process was established with the understanding that setting the curves is a complex and time consuming process, the factors that affect the curve are subject to constant change, and such change will be evaluated and properly addressed in a comprehensive review at the next reset process."[178]

---

[177]  *Id.* P 23.

[178]  *Id.*

67

FERC agreed and "adopted their [the NYPSC, the City of New York and others opposing the IPPNY complaint] arguments."[179]  FERC laid out the precedent it failed to follow in this appeal, *i.e.*, in setting just and reasonable rates during the demand curve reset, it would not look at a change in one cost component after the reset had been approved.  FERC said:

> In setting a just and reasonable rate, the Commission does not look at a single component but rather, looks at all components, "some of which may have gone up over time and some of which may have gone down over time, thus a change in a single component . . . does not therefore necessarily mean that the overall rate has become unjust and unreasonable."[180]

FERC based that precedent on the need to promote the price stability and certainty of the demand curve reset.[181]  FERC added that, if it reviewed a change in one cost component after the approval of the 2008 demand curve reset [(*i.e.*, New York's decision to eliminate the property tax exemption)], it would have to review all costs components, and that review would reignite debate on all the factors in the 2008 demand curve reset.[182]  Specifically, FERC said:

---

[179] *Id.* P 33.

[180] *Id.*

[181] *Id.* P 35.

[182] *Id.*

> The Commission must balance the need for an out-of-cycle adjustment [because of the requirement to now pay property taxes] to provide proper price signals to encourage new economic capacity entry against the value of price stability, and certainty to customers in the market. The ICAP Demand Curve process is based on the premise that price stability and certainty are important to the market. . . .  To reopen and start anew the lengthy review process now would re-ignite the debate over all of the factors that determine the Demand Curves and would promote confusion and uncertainty rather than stability in the market with uncertain future benefits.[183]

In further support for not acting on the proposed change, FERC cited an earlier NYISO demand curve reset decision in which it said, "a decision must be made based on the information on hand [the information from the demand curve reset filing] and adjustments based on selected post test year data can throw off the balance between offsetting factors."[184]

---

[183] *Id.*

[184] *New York Indep. Sys. Operator, Inc.*, 112 FERC ¶ 61,283, at PP 37-38, 39 (2005) (refusing on rehearing to use updated data [the 2005 Gold Book] for the 2005 demand curve reset because the data was not evaluated by NYISO consultants and stakeholders, and doing so would "create a precedent for further – month-by-month, perhaps – adjustments as data and circumstances change in New York over the three year period, which would promote uncertainty rather than stability.") ("2005 NYISO Order").

## ii.    The Case on Appeal

Moving forward to the 2011 demand curve reset, FERC failed to follow *IPPNY* (and the 2005 NYISO Order) even though the circumstances are indistinguishable.

At the time of NYISO's November 30 Filing, property taxes in NYC were governed by an August 3, 2010 policy under which local authorities in NYC had the discretion to determine whether property taxes would be paid.[185]

Based on that policy, FERC included property taxes in the 2011 demand curve reset. FERC said, "it is not just and reasonable to assume full or, in fact, any tax abatement [(*i.e.*, exemption from property taxes for power plants)] for the NYC [ ] peaking unit"[186] because (a) the "questionable eligibility" of a peaking unit for the abatement[187] and (b) "the fact that such abatement is discretionary"[188] under the provisions of the August 3, 2010 policy and not a matter of right as it was at the time of the *IPPNY Complaint Order*.

Various parties sought rehearing on the decision to include property taxes based on the August 3, 2010 policy. On May 18, 2011, (six months after the November 30 Filing, four months after FERC's January 28 Order, and two and one

---

[185]  January 28 Order at P 66.

[186]  *Id.* P 88.

[187]  *Id.* P 90.

[188]  *Id.*

70

half months after requests for rehearing of the January 28 Order were filed) the property tax laws in NYC underwent a complete rewrite from the August 3, 2010 policy. More specifically, on that date, the New York Governor signed into law amendments to the NYC property tax laws ("May 18 Amendment")[189] that attempted to exclude the specific generating facility used in the demand curve reset (but no others) from the payment of property taxes.

On the same day that the Governor signed the May 18 Amendment, the NYPSC and City of New York, two of the parties that opposed changing the 2008 demand curve reset based on a subsequent change in the property tax laws, reported that changed to FERC. Pursuant to 18 C.F.R. § 385.212, they filed a *Motion to Lodge and for Expedited Ruling on an Amendment to the New York Real Property Tax Law to Provide Tax Abatements for Peaking Generating Facility by the City of New York and the New York Public Service Commission*, Docket No. ER11-2224-000, *et al.* (filed on May 18, 2011) ("Motion to Lodge"), requesting that FERC consider the impact of the new law on the pending petitions for rehearing.

In *IPPNY*, when presented with a change to a single component of the demand curve reset subsequent to its approval of the triennial demand curve, FERC refused to modify its previous decision. In the case on the appeal, however,

---

[189]  2011 N.Y. Laws Chapter 28 (May 18, 2011).

WAS:184083.7

less than 24 hours after being notified of the change in New York law, FERC granted rehearing of its January 28 Order and excluded property taxes from the demand curve reset. FERC did not base its rehearing on the August 3, 2010 policy – the record at the time of the 2011 demand curve reset filing and the basis for FERC including property taxes – but excluded property taxes because "this development [the May 18 Amendment] ameliorates the concerns that the Commission had with the discretionary nature of the [the August 3, 2010 policy] and the [August 3, 2010 policy] eligibility criteria . . . ."[190]

> ### b.  FERC engaged in arbitrary and capricious decision-making in its explanation for not applying its *IPPNY Complaint Order* precedent

FERC tried to distinguish its *IPPNY Complaint Order* precedent on two grounds:  (1) the May 18 Amendment revising the property tax law was enacted while the matter was pending rehearing; and (2) the complainants in *IPPNY* did not carry their burden.  Both reasons are a distinction without a difference to the fundamental precedent in the *IPPNY Complaint Order*, *i.e.*, after the approval of the demand curve reset, it is not just and reasonable to engage in piecemeal ratemaking and review a change in one cost component.

First, FERC says that the change in the property tax law occurred while rehearing was pending on the property tax issue.

---

[190]  May 19 Order at P 43.

> In contrast [to *IPPNY*], the Commission reversed its decision on the tax abatement in this proceeding in response to changed circumstances brought to its attention on rehearing.... Under the Commission's regulations, parties have 30 days to seek rehearing of a Commission decision. Accepting the New York City Suppliers' argument that we should apply the *IPPNY* ruling to this case would render the right to seek rehearing meaningless.[191]

That rehearing was pending is a distinction without any difference from *IPPNY*. If just and reasonable rates can be set by looking at a change in one cost component after the approval of the demand curve reset, FERC had every opportunity to apply that precedent in the *IPPNY Complaint Order*. But FERC said in *IPPNY* that it would not look at a change in one component after approving the reset and thus it makes no difference that rehearing was pending here.

In both *IPPNY* and this appeal, the demand curve reset orders were pending on rehearing when New York changed its property tax rules. In *IPPNY*, no party challenged the property tax issue – because the New York law in effect at the time was clear, and there was no reason to discuss property taxes – but parties did file for rehearing on other issues. FERC in fact denied IPPNY's complaint on the same day – December 18, 2008 – as it acted on the pending rehearing petitions of the 2008 reset order on issues other than property taxes. Because the 2008 demand curve was still pending rehearing, FERC could have granted IPPNY's complaint

---

[191]  December 15 Order at P 27.

73

(no one contested that property taxes would now be paid, the issue was whether to modify the 2008 demand curve reset) and on its own motion could have granted rehearing of the 2008 demand curve reset and included property taxes.[192]

But FERC declined to act *sua sponte* in *IPPNY* and instead established the precedent that it does not set just and reasonable rates in the demand curve reset by looking at one cost component in isolation. In this case, however, FERC did exactly the opposite – it looked at a change in the property tax component after the approval of the 2011 demand curve reset. FERC cannot justify its departure from the *IPPNY* precedent because rehearing on the property tax issue was pending.

Second, FERC says that IPPNY did not carry its burden under FPA Section 206 in the *IPPNY Complaint Order* (and by implication the NYPSC and NYC did carry their burden under FPA Section 205 in this case). But that argument fails to come to grips with setting just and reasonable rates in the context of the demand curve reset. In *IPPNY*, FERC set forth its precedent that it would not look at one

---

[192] *See Valero Interstate Transmission Co. v. FERC*, 903 F.2d 364, 368 (5th Cir. 1990) (citing therein *Tennessee Gas Pipeline Co. v. FERC*, 871 F.2d 1099 (D.C. Cir. 1989)) (explaining that FERC has the authority to modify a prior order *sua sponte*, even as to the matters not raised in a timely petition for rehearing, as long as a petition for rehearing of that order was timely filed on some other grounds); *ISO New England Inc.*, 115 FERC ¶ 61,332, at 62,243 n.7 (2006) (granting rehearing *sua sponte*, even when no rehearing was pending and the time for appeal passed of a final order on lobbying costs, relying on FERC's statutory power "to modify an order 'at any time' before the record of the proceeding is filed in a court of appeals (and in that case when no appeal was filed.)).

74

component of a just and reasonable rate even if that cost component had been subject to a significant change.  If that indeed is the precedent, then that precedent should have been applied both in this appeal and in *IPPNY*.  Whether it is a Section 205 or 206 proceeding should not be a distinguishing factor because, ultimately, both sections involve setting just and reasonable rates (and thus should not involve looking at one cost component in isolation).

### 2. FERC's Orders Excluding Property Taxes from the Calculation of the Cost of New Entry for Purposes of Setting the Demand Curve are Arbitrary, Capricious, and Not Based on Substantial Evidence in the Record

To avoid a determination that its orders are arbitrary and capricious, FERC is required to support its decision with substantial evidence on the record.[193]  In the January 28 Order, FERC found that "it is not just and reasonable to assume full or, in fact, any tax abatement for the NYC [ ] peaking unit."[194] This determination regarding the implications of the property tax laws then in effect was based on an evidentiary record consisting (and FERC's review) of two reports (the consultants' report and the NYISO report included in the November 30 Filing) and multiple pleadings (both pro and con) on the issue of whether property taxes should be included in the calculation of the cost of new entry.

---

[193]    *State Farm*, 463 U.S. at 43.

[194]    January 28 Order at P 88.

75

In contrast, the day after the May 18 Amendment was signed, armed with only (i) a copy of the legislation and (ii) the NYPSC's and the NYC's self-serving statements (rates would go down if property taxes were excluded), and without allowing the fifteen (15) day comment period to run on the Motion to Lodge, FERC abruptly reversed its decision and found that "inclusion of the tax abatement assumption in calculating the NYC net CONE is appropriate," and that the May 18 Amendment "mandate[s] the assumption that tax abatement will apply to any new peaking unit in NYC."[195]

While the stated purpose of the May 18 Amendment is to provide tax abatement as-of-right to all peaking units (or at least to the selected proxy unit), Petitioners pointed out two critical exceptions contained in the May 18 Amendment that could render illusory FERC's hastily-reached assumption that the May 18 Amendment realized its stated purpose. Those two exceptions are: (1) the provision that a new peaking unit will not qualify for tax abatement if the cost of the industrial construction work on the generation facility is less than 30% of the property's taxable assessed value (the "30% requirement"); and, (2) the requirement that a peaking unit other than the proxy peaking unit designated pursuant to Section 5.14.1.2 of the Services Tariff must have an annual average run

---

[195] May 19 Order at PP 42-43.

WAS:184083.7

time of less than 18 hours per start (excluding emergency operations) (the "18 hour run issue").[196]

Rather than build a record on whether, in light of these two critical exceptions, the May 18 Amendment would provide full tax abatement as-of-right similar to the record it used to support its decision in the January 28 Order, FERC barreled ahead. It dismissed Petitioners' concerns that these two exemptions will result in the proxy unit paying property taxes with the conclusory statement that, because the 30% requirement "is clearly known up front," developers can "make the determination as to whether their project meets the 30% taxable assessed value threshold prior to proceeding" and "it is reasonable to conclude that peaking units operate *on average* no more than 18 hours per start. . . ."[197]

FERC's reasoning on the 30% issue misses the boat. This proceeding is about determining the costs of building generating in NYC; whether that proxy unit is subject to taxation is a critical factual issue on which the remainder of the rate (and thus the generation built) hinges. To state that a developer will simply not build if it expects to be subject to property taxes misses the point of the entire

---

[196]   May 18 Amendment, §§ 2, 3.

[197]   December 15 Order at P 35 (emphasis in original).

WAS:184083.7

demand curve process, which is to put in place a rate structure that will result in new generation being built.[198]

Moreover, these "general and conclusory" statements are not what this Court demands.[199] "An agency's unsupported assertion does not amount to substantial evidence."[200]

FERC's rhetoric on the 30% issue is not unlike *Charlottesville*. In that case, FERC justified allowing the parent corporation to retain tax savings from a consolidated tax return in part because it would be used for exploration and development.[201] This Court found no evidence, however, for FERC's theory and remanded the case back to FERC for further proceedings.[202]

Moreover, on the 18-hour run issue, FERC completely failed to address (or provide proceedings to address) Petitioners' challenge regarding whether *full* tax abatement was appropriate, or whether only partial abatement should be included, particularly because the 18-hour per start run time would be assessed annually and

---

[198] *Electricity Consumers*, 407 F.3d at 1241-42 (upholding original demand curve order that FERC said "would provide better price signals to investors for construction for new generation.").

[199] *Algonquin*, 984 F.2d at 1312.

[200] *Id.* at 1313; *see also City of Charlottesville v. FERC*, 661 F.2d 945, 954 (D.C. Cir. 1981) ("*Charlottesville*") ("This Court has never allowed rhetoric as a substitute for a record.").

[201] *Charlottesville*, 661 F.2d at 953.

[202] *Id.*

undoubtedly cause the proxy peaking unit to pay some share of property taxes. FERC's complete failure to consider these important aspects renders its orders arbitrary and capricious.[203]

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court: (i) vacate the five orders under review; and (ii) remand the matter to FERC with directions consistent with the Court's order and for further articulation and consideration of the issues discussed herein.

Respectfully submitted,

/s/ Kenneth L. Wiseman

Kristine L. Delkus
TransCanada Corporation
450 – 1st Street, S.W.
Calgary, AB
Canada T2P 5H1
Tel: (403) 920-2161
Email: kristine_delkus@transcanada.com
James M. D'Andrea
TransCanada USA Services Inc.
110 Turnpike Road, Suite 203
Westborough, MA 01581
Tel: (508) 475-6088

Kenneth L. Wiseman
Mark F. Sundback
Lisa M. Purdy
William M. Rappolt
J. Peter Ripley
Blake R. Urban
Andrews Kurth LLP
1350 I Street, NW, Suite 1100
Washington, DC 20005
Tel: (202) 662-2700
Fax: (202) 662-2739
E-mail: kwiseman@andrewskurth.com

---

[203] *Panhandle E. Pipe Line Co. v. FERC*, 890 F.2d 435, 442 (D.C. Cir. 1989) (remanding the case back to FERC finding the agency orders "arbitrary and capricious because [FERC] entirely failed to consider an important aspect of the problem").

79

E-mail: jim_dandrea@transcanada.com

E-mail: msundback@andrewskurth.com
E-mail: lpurdy@andrewskurth.com
E-mail: pripley@andrewskurth.com
E-mail: burban@andrewskurth.com

**Attorneys for TC Ravenswood, LLC**

*/s/ Robert C. Fallon*

Christopher C. O'Hara
Abraham H. Silverman
NRG Energy, Inc.
211 Carnegie Center
Princeton, NJ 08540
Tel: (609) 524-4696
E-mail:
Abraham.silverman@nrgenergy.com
E-mail: Chris.ohara@nrgenergy.com

Robert C. Fallon
Marcia A. Stanford
Leonard, Street and Deinard
1350 I Street, NW
Suite 800
Washington, DC 20005
Tel: (202) 346-6900
E-mail: Fallonr@leonard.com
E-mail: Marcia.Stanford@leonard.com

**Attorneys for NRG Companies**

DATED: July 13, 2012

80

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Cir. R. 32(a), as modified by order of this Court, because this brief contains 17,301 words (not to exceed 17,500 words), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1).


2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 point font, times new roman.


*/s/ Kenneth L. Wiseman*
Kenneth L. Wiseman
Attorney for TC Ravenswood, LLC
Dated:  July 13, 2012

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Fed. R. of App. P. 25(c) and Cir. R. 25(c), I hereby certify that I

have this day served the foregoing document upon the counsel listed below via this

Court's CM/ECF system, U.S. Mail or hand delivery.

Robert Solomon, Solicitor
Jennifer S. Amerkhail
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

David G. Tewksbury
Ashley Charles Parrish
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006

Neil H. Butterklee
Consolidated Edison Company of New York, Inc.
4 Irving Place, Room 1875-S
New York, NY 10003

Joseph J. Saltarelli
Hunton & Williams LLP
200 Park Avenue
New York, NY 10166

Sean Mullany, Esq.
Public Service Commission of the State of New York
18th Floor
Three Empire State Plaza
Albany, NY 12223-1350

Kevin M. Lang
Couch White, LLP
540 Broadway
P.O. Box 22222
Albany, New York 12201

Dated at Washington, D.C., this 13th day of July, 2012.

*/s/ Kenneth L. Wiseman*
Kenneth L. Wiseman
Attorney for TC Ravenswood, LLC

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM TABLE OF CONTENTS

5 U.S.C. § 706 ................................................................................ 1

16 U.S.C. §§ 791a, *et seq.* ............................................................ 2

16 U.S.C. § 824d .......................................................................... 3

16 U.S.C. § 825I ........................................................................... 5

18 C.F.R. § 35.17 ......................................................................... 7

18 C.F.R. § 385.212 ...................................................................... 9

TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**Go to the United States Code Service Archive Directory**

5 USCS § 706

THE CASE NOTES SEGMENT OF THIS DOCUMENT HAS BEEN SPLIT INTO 2 DOCUMENTS.
THIS IS PART 1.
USE THE BROWSE FEATURE TO REVIEW THE OTHER PART(S).

§ 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all
relevant questions of law, interpret constitutional and statutory provisions, and determine the
meaning or applicability of the terms of an agency action. The reviewing court shall--
  (1) compel agency action unlawfully withheld or unreasonably delayed; and
  (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
   (B) contrary to constitutional right, power, privilege, or immunity;
   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
   (D) without observance of procedure required by law;
   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this
title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing
provided by statute; or
   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the
reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts
of it cited by a party, and due account shall be taken of the rule of prejudicial error.

TITLE 16. CONSERVATION
CHAPTER 12. FEDERAL REGULATION AND DEVELOPMENT OF POWER
REGULATION OF THE DEVELOPMENT OF WATER POWER AND RESOURCES

**Go to the United States Code Service Archive Directory**

16 USCS § 791a

§ 791a.  Short title

This Act [16 USCS §§ 791a et seq.] may be cited as the "Federal Power Act."

TITLE 16. CONSERVATION
CHAPTER 12. FEDERAL REGULATION AND DEVELOPMENT OF POWER
REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**Go to the United States Code Service Archive Directory**

16 USCS § 824d

§ 824d.  Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

(a) Just and reasonable rates. All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful. No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules. Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Notice required for rate changes. Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Suspension of new rates; hearings; five month period. Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or

public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause".

(1) Not later than 2 years after the date of the enactment of this subsection [Nov. 9, 1978] and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine--

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are--

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to--

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

TITLE 16. CONSERVATION
CHAPTER 12. FEDERAL REGULATION AND DEVELOPMENT OF POWER
LICENSES AND PUBLIC UTILITIES; PROCEDURAL AND ADMINISTRATIVE PROVISIONS

**Go to the United States Code Service Archive Directory**

16 USCS § 825l

§ 825l.  Review of orders

(a) Application for rehearing; time periods; modification of order. Any person, electric utility,
State, municipality, or State commission aggrieved by an order issued by the Commission in a
proceeding under this Act [16 USCS §§ 791a et seq.] to which such person, electric utility,
State, municipality, or State commission is a party may apply for a rehearing within thirty days
after the issuance of such order. The application for rehearing shall set forth specifically the
ground or grounds upon which such application is based. Upon such application the Commission
shall have power to grant or deny rehearing or to abrogate or modify its order without further
hearing. Unless the Commission acts upon the application for rehearing within thirty days after
it is filed, such application may be deemed to have been denied. No proceeding to review any
orders of the Commission shall be brought by any entity unless such entity shall have made
application to the Commission for a rehearing thereon. Until the record in a proceeding shall
have been filed in a court of appeals, as provided in subsection (b), the Commission may at any
time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside,
in whole or in part, any finding or order made or issued by it under the provisions of this Act
[16 USCS §§ 791a et seq.].

(b) Judicial review. Any party to a proceeding under this Act [16 USCS §§ 791a et seq.]
aggrieved by an order issued by the Commission in such proceeding may obtain a review of
such order in the Circuit Court of Appeals of the United States [United States Court of Appeals]
for any circuit wherein the licensee or public utility to which the order relates is located or has
its principal place of business, or in the United States Court of Appeals for the District of
Columbia, by filing in such court, within sixty days after the order of the Commission upon the
application for rehearing, a written petition praying that the order of the Commission be
modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted
by the clerk of the court to any member of the Commission and thereupon the Commission
shall file with the court the record upon which the order complained of was entered, as provided
in section 2112 of title 28, United States Code. Upon the filing of such petition such court shall
have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify,
or set aside such order in whole or in part. No objection to the order of the Commission shall be
considered by the court unless such objection shall have been urged before the Commission in
the application for rehearing unless there is reasonable ground for failure so to do. The finding
of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If
any party shall apply to the court for leave to adduce additional evidence, and shall show to the
satisfaction of the court that such additional evidence is material and that there were
reasonable grounds for failure to adduce such evidence in the proceedings before the
Commission, the court may order such additional evidence to be taken before the Commission
and to be adduced upon the hearing in such manner and upon such terms and conditions as to
the court may seem proper. The Commission may modify its findings as to the facts by reason
of the additional evidence so taken, and it shall file with the court such modified or new findings
which, if supported by substantial evidence, shall be conclusive, and its recommendation, if
any, for the modification or setting aside of the original order. The judgment and decree of the
court, affirming, modifying, or setting aside, in whole or in part, any such order of the
Commission, shall be final, subject to review by the Supreme Court of the United States upon
certiorari or certification as provided in sections 239 and 240 of the Judicial Code, as amended
(U. S. C., title 28, secs. 346 and 347) [28 USCS § 1254].

Get a Document - by Citation - 16 USCS § 825l

(c) Stay of Commission's order. The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

TITLE 18 -- CONSERVATION OF POWER AND WATER RESOURCES
CHAPTER I -- FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY
SUBCHAPTER B -- REGULATIONS UNDER THE FEDERAL POWER ACT
PART 35 -- FILING OF RATE SCHEDULES AND TARIFFS
SUBPART C -- OTHER FILING REQUIREMENTS

**Go to the CFR Archive Directory**

18 CFR 35.17

§ 35.17 Withdrawals and amendments of rate schedule, tariff or service agreement filings.

(a) Withdrawals of rate schedule, tariff or service agreement filings prior to Commission action. (1) A public utility may withdraw in its entirety a rate schedule, tariff or service agreement filing that has not become effective and upon which no Commission or delegated order has been issued by filing a withdrawal motion with the Commission. Upon the filing of such motion, the proposed rate schedule, tariff or service agreement sections will not become effective under section 205(d) of the Federal Power Act in the absence of Commission action making the rate schedule, tariff or service agreement filing effective.

(2) The withdrawal motion will become effective, and the rate schedule, tariff or service agreement filing will be deemed withdrawn, at the end of 15 days from the date of filing of the withdrawal motion, if no answer in opposition to the withdrawal motion is filed within that period and if no order disallowing the withdrawal is issued within that period. If an answer in opposition is filed within the 15 day period, the withdrawal is not effective until an order accepting the withdrawal is issued.

(b) Amendments or modifications to rate schedule, tariff or service agreement sections prior to Commission action on the filing. A public utility may file to amend or modify, and may file a settlement that would amend or modify, a rate schedule, tariff or service agreement section contained in a rate schedule, tariff or service agreement filing that has not become effective and upon which no Commission or delegated order has yet been issued. Such filing will toll the notice period in section 205(d) of the Federal Power Act for the original filing, and establish a new date on which the entire filing will become effective, in the absence of Commission action, no earlier than 61 days from the date of the filing of the amendment or modification.

(c) Withdrawal of suspended rate schedules, tariffs, or service agreements, or parts thereof. Where a rate schedule, tariff, or service agreement, or part thereof has been suspended by the Commission, it may be withdrawn during the period of suspension only by special permission of the Commission granted upon application therefor and for good cause shown. If permitted to be withdrawn, any such rate schedule, tariff, or service agreement may be refiled with the Commission within a one-year period thereafter only with special permission of the Commission for good cause shown.

(d) Changes in suspended rate schedules, tariffs, or service agreements, or parts thereof. A public utility may not, within the period of suspension, file any change in a rate schedule, tariff, or service agreement, or part thereof, which has been suspended by order of the Commission except by special permission of the Commission granted upon application therefor and for good cause shown.

(e) Changes in rate schedules, tariffs or service agreements or parts thereof continued in effect and which were proposed to be changed by the suspended filing. A public utility may not, within the period of suspension, file any change in a rate schedule, tariff or service agreement or part thereof continued in effect by operation of an order of suspension and which was proposed to be changed by the suspended filing, except by special permission of the Commission granted

upon application therefor and for good cause shown.

TITLE 18 -- CONSERVATION OF POWER AND WATER RESOURCES
CHAPTER I -- FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY
SUBCHAPTER X -- PROCEDURAL RULES
PART 385 -- RULES OF PRACTICE AND PROCEDURE
SUBPART B -- PLEADINGS, TARIFF AND RATE FILINGS, NOTICES OF TARIFF OR RATE
EXAMINATION, ORDERS TO SHOW CAUSE, INTERVENTION, AND SUMMARY DISPOSITION

**Go to the CFR Archive Directory**

18 CFR 385.212

§ 385.212 Motions (Rule 212).

(a) General rule. A motion may be filed:

(1) At any time, unless otherwise provided;

(2) By a participant or a person who has filed a timely motion to intervene which has not been denied;

(3) In any proceeding except an informal rulemaking proceeding.

(b) Written and oral motions. Any motion must be filed in writing, except that the presiding officer may permit an oral motion to be made on the record during a hearing or conference.

(c) Contents. A motion must contain a clear and concise statement of:

(1) The facts and law which support the motion; and

(2) The specific relief or ruling requested.